2016 IL App (1st) 090884-C

FOURTH DIVISION
June 30, 2016

No. 1-09-0884

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 94 CR 11795 |
| | ) | |
| LARON WARREN, | ) | Honorable |
| | ) | Arthur F. Hill, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justice Gordon specially concurred, with opinion.
Presiding Justice McBride concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    In 1997, defendant Laron Warren was convicted of the murder of Ebony Higgins. At defendant's bench trial, the State's witnesses identified him as the man who shot Higgins from the front passenger-side window of a car. Defendant presented evidence that a man named Willie Madlock shot Higgins.

¶ 2    At the time of the offense, defendant was 17 years old. Because defendant had previously been convicted of murder, the trial court was required to sentence defendant to incarceration for the rest of his natural life. 730 ILCS 5/5-8-1(a)(1)(c)(i) (West 1994).

¶ 3    In 1999, defendant filed a postconviction petition with the assistance of counsel. The petition alleged, among other things, that defendant was actually innocent. But defendant's counsel did not attach affidavits or other evidence to support that argument. Counsel told the court that, while he knew of potential witnesses who could potentially substantiate this claim, he did not secure signatures from them in order to prepare affidavits. The trial court dismissed the petition in

part for a lack of evidentiary support, and we affirmed the trial court's judgment. *People v. Warren*, No. 1-04-2380 (2006) (unpublished order under Supreme Court Rule 23).

¶ 4     In 2009, defendant sought leave to file a second postconviction petition, which again raised his claim of actual innocence. This time, defendant attached four affidavits—some of which appeared to have been drafted around the time of his first postconviction petition but were not signed or notarized until years later—to support his assertion that Madlock was guilty of Higgins's murder. The trial court found that defendant failed to state a claim of actual innocence because the affidavits did not constitute newly discovered evidence.

¶ 5     This court first affirmed the trial court's judgment in 2011. *People v. Warren*, 2011 IL App (1st) 090884-U. In a supervisory order, the Illinois Supreme Court directed us to vacate that decision and to reconsider it in light of *People v. Edwards*, 2012 IL 111711, ¶¶ 20-29, which clarified the standards applicable to actual-innocence claims raised in successive postconviction petitions. *People v. Warren*, No. 113184 (Ill. May 30, 2012). In 2013, we again affirmed the dismissal of defendant's successive petition because defendant had not supported his petition with newly discovered evidence. *People v. Warren*, 2013 IL App (1st) 090884-U. Justice Gordon dissented from that decision. *Id.* ¶¶ 63-77 (Gordon, J., dissenting).

¶ 6     On January 28, 2015, the Illinois Supreme Court issued another supervisory order, directing us to vacate our 2013 order and to reconsider our judgment in light of *People v. Davis*, 2014 IL 115595. *People v. Warren*, No. 117157 (Ill. Jan. 28, 2015). In *Davis*, the Illinois Supreme Court held that the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2469 (2012), which held that mandatory sentences of natural life without parole for defendants under the age of 18 violate the eighth amendment of the United States Constitution, applied retroactively. *Davis*, 2014 IL 115595, ¶¶ 36-40.

¶ 7    Pursuant to the Illinois Supreme Court's supervisory order, in a previous order we vacated our prior judgment in *Warren*, 2013 IL App (1st) 090884-U, and this opinion will now stand as our disposition of this matter. For the reasons stated below, we now vacate defendant's mandatory life-without-parole sentence, which was imposed on defendant for conduct he committed when he was 17 years old, and remand for resentencing. We also reverse the trial court's order denying defendant leave to file his successive postconviction petition because defendant established a colorable claim of actual innocence justifying further proceedings on his successive petition.

¶ 8                                 I. BACKGROUND

¶ 9                            A. Trial and Direct Appeal

¶ 10    As we have discussed the evidence adduced at trial at length in our prior order regarding defendant's direct appeal (*People v. Warren*, No. 1-97-4010 (1999) (unpublished order under Supreme Court Rule 23)), we will not reiterate those facts at length. We discuss the trial evidence to the extent necessary to resolve this appeal.

¶ 11    On the afternoon of April 3, 1994, Ebony Higgins, Michael Stampley, Demario Jackson, Jutoy Hoskins, Kevin Smith, and Ebony's boyfriend, Omar Muhammad, were walking along the sidewalk on 107th Street in Chicago, heading to Muhammad's house. As the group walked, Stampley and Jackson were the closest to the street, just behind Higgins. A car hit the curb behind them, and Jackson and Stampley turned around. They saw two people in the front seats of a blue, four-door Buick. The passenger, whom both Jackson and Stampley identified as defendant, stuck his arm and part of his head out of the car window and began shooting.

¶ 12    After the shooting, Jackson told the police that the shooter was a 20-year-old African-American male with a light complexion and "corn" braids in his hair. Stampley said that the man was clean shaven and had a chubby face.

¶ 13     Muhammad also testified, but he did not see the car or its occupants because he did not turn around after he heard tires screeching behind him. He testified that he heard four gunshots and tried to push Higgins away from the street, but she was struck after Muhammad heard two more gunshots.

¶ 14     On April 7, 1994, Jackson and Stampley saw the Buick again, traveling south on 106th Street. They took down the license plate number and gave it to the police.

¶ 15     On April 9, 1994, the police found the Buick abandoned on the side of the highway. It had been severely damaged in an accident. The police processed the car and found fingerprints on the passenger side of the interior rear-view mirror; the rear, passenger-side window; and the rear, driver-side quarter panel. Ten of those prints were submitted for latent fingerprint examination. According to latent print examiner Richard McGrath, a print found on the rear, passenger-side window matched defendant's left thumb print.

¶ 16     After defendant's arrest, the police arranged for him to be included in a lineup. Stampley and Jackson separately viewed the lineup eight days after the shooting and immediately identified defendant as the shooter. Jackson conceded that defendant's complexion at trial was darker than it appeared in the lineup. Jackson also conceded that defendant did not look heavyset in the lineup. Stampley testified that, in the lineup, defendant had facial hair and that his face looked "kind of wide" or "filled in," not fat.

¶ 17     Defendant presented evidence that he was not present for the shooting, and that a man named Willie Madlock killed Higgins. Dejuan Jones testified that, on April 3, 1994, he was in the rear, driver-side seat of the blue Buick traveling on 107th Street. According to Jones, defendant was not in the car. Germaine Bledsoe was driving, Madlock was in the front passenger seat, and a man named Clay was in the rear, passenger-side seat. Jones heard Madlock yell, "There go [*sic*]

Herman." Bledsoe then drove the car up onto the curb and Madlock began to shoot at a group of eight or nine people with a revolver. Jones ducked down in the car, so he did not see whether Madlock shot anyone. After Madlock fired four or five shots, Bledsoe sped away. Jones admitted that he had not disclosed this information to the police before trial. At the time of trial, Jones, who was incarcerated for murder, had been defendant's friend for 10 years.

¶ 18    Sylvia Stewart, defendant's aunt, testified that defendant attended a party she hosted on April 3, 1994. Sylvia testified that her son picked defendant up and brought him to the party between 9:30 and 10 a.m. Between 2 and 2:30 p.m., defendant and Sylvia left to pick up defendant's girlfriend and three friends, then returned. Sylvia testified that defendant did not leave the party again until 10:30 p.m.

¶ 19    On cross-examination, Sylvia denied telling an investigator that she could not speak with him because she needed time to get her "story straight." She conceded that she knew defendant had been arrested soon after April 3, 1994, and that she never told the police that defendant had been at her home during the shooting. During the State's rebuttal, the parties stipulated that an investigator would testify that Sylvia had refused to speak with him, saying that she needed time to get her story straight.

¶ 20    Lavelle Stewart, defendant's cousin and Sylvia's son, also testified that defendant was at the party on April 3, 1994. Like Sylvia, Lavelle said that he picked defendant up and brought him to the party around 10:30 a.m. Lavelle also testified that Sylvia and defendant left around 12:30 p.m. to pick up defendant and three friends. After returning, defendant remained at the party until 11 or 11:30 p.m.

¶ 21    On cross-examination, Lavelle testified that defendant and his girlfriend went upstairs around 6 or 7 p.m. and did not come back down until he left. He also testified that he heard

defendant had been charged with murder just two days after the party, but Lavelle did not tell the police that defendant was with him on April 3, 1994.

¶ 22    The trial court found defendant guilty of murder. At sentencing, the trial court stated, "[P]ursuant to statute it is mandatory that the defendant be sentenced to life imprisonment without parole in the Illinois Department of Corrections."

¶ 23    Defendant appealed his conviction, asserting that the State had failed to prove him guilty beyond a reasonable doubt, and that his mittimus should be corrected to reflect only one count of first-degree murder. This court affirmed defendant's conviction, corrected the mittimus, and vacated the other count of murder. *People v. Warren*, No. 1-97-4010 (1999) (unpublished order under Supreme Court Rule 23).

¶ 24                          B. First Postconviction Petition

¶ 25    On December 27, 1999, with the assistance of court-appointed counsel, defendant filed a postconviction petition alleging, among other claims, that he was innocent of Higgins's murder. Counsel argued that defendant had "recently discovered evidence" that corroborated his trial defense and proved his innocence. Counsel did not attach any affidavits or other evidence to support this contention.[1] The State moved to dismiss defendant's petition.

¶ 26    On July 1, 2004, the trial court held a hearing on the State's motion to dismiss. Postconviction counsel conceded that he had "no affidavit in support" of defendant's actual-innocence claim. He said that he had previously been in touch with "three witnesses" who he thought would provide him with statements, but because the statute of limitations on defendant's petition was running out, "we had to file something timely so we filed it" without those

_____

[1] On appeal, the State claims that counsel filed an amended petition in 2001 that "dropped the actual innocence claim." The State is mistaken. The amended petition reiterates the actual-innocence claim, albeit without any evidentiary support.

affidavits.

¶ 27    In support of its motion to dismiss, the State argued that the petition had no affidavits to support the actual-innocence claim and that the trial court should dismiss that claim "for that reason alone." Defendant's lawyer, in his oral argument to the trial court, made no substantive argument whatsoever concerning the actual-innocence claim. The trial court continued the case for a ruling on the motion.

¶ 28    On July 13, 2004, before the trial court had ruled on defendant's petition, defendant filed a motion seeking new counsel. Defendant asserted that his postconviction attorney "failed to investigate thoroughly and to present evidence that could [have] cleared" him. Defendant said that he and his family had given counsel "large[ ] sums of money" to investigate this evidence, and that neither he nor his family could "afford legal representation due to having spent large[ ] sums of money on ineffective counsel."

¶ 29    On August 9, 2004, the trial court addressed defendant's motion to substitute counsel. With regard to the absence of evidence to support the petition, defense counsel explained:

> "[T]here is a witness, two witnesses who for a long period of time, and I mean years, had told family members and friends that they were willing to come in and provide an affidavit with respect to one of the two claims, but those witnesses while they came to our office never were willing to give an affidavit, and *** the [defendant's] mother, who was in attendance at most of the Court proceedings up until maybe five or six months ago, was aware of that because she came in with the gentleman once and left with him, knowing that he didn't sign the affidavit."

The court denied defendant's motion to substitute his attorney.

¶ 30    At the same hearing, the trial court granted the State's motion to dismiss defendant's

postconviction petition. The court dismissed defendant's actual-innocence claim because he did not attach affidavits or other evidence to support it, stating, "[W]ith regard to the newly-discovered evidence claims, *** there are no affidavits in support of those claims ***. Those portions of the post-conviction that refer to newly-discovered evidence will be dismissed." Defendant appealed, and we affirmed the trial court's judgment. *People v. Warren*, No. 1-04-2380 (2006) (unpublished order under Supreme Court Rule 23). On appeal, defendant did not allege that his postconviction attorney's performance was deficient. *Id.*

¶ 31                                    C. Second Postconviction Petition

¶ 32    On January 5, 2009, defendant, this time acting *pro se*, filed a motion seeking leave to file a successive postconviction petition, along with a copy of his successive petition. In his motion for leave to file, defendant asserted that, "at the time [his] initial post-conviction petition was filed ***, his claim of newly discovered evidence *** was not fully developed." He said that he did not receive the affidavits supporting his claim of actual innocence until "late 2006, 2007, and 2008." Defendant said that he established "cause" justifying his filing of a successive petition because he "was unable to gain and complete the evidence to raise" his claim earlier.

¶ 33    Defendant's petition included four affidavits, as well as two unsworn writings. As defendant does not claim that the unsworn writings are evidence supporting his claim, we will confine our discussion to the four affidavits.

¶ 34    The first affidavit was from Grace Warren, defendant's mother. She attested that Willie Madlock had told her over the phone and in person that he shot Ebony Higgins, and that defendant was not in the car at the time of the shooting. She did not specify when these conversations took place. Grace also stated that she brought Madlock to "attorney [*sic*] office," but that Madlock did not confess once he was there.

¶ 35    The second affidavit was from Andrea Young, who was raised in the same neighborhood as defendant. Young said that she knew defendant was in prison for murder, but she did not know the date of the murder or the details of the incident. Young knew a man named "Willie" who was friends with Germaine Bledsoe and her nephew, but she did not know Willie's last name. According to Young, Bledsoe had died, but Willie was still living in Chicago. Young said that she and her nephew spoke to Willie in the park one day and, during their conversation, he told her "that he knew [defendant] was in prison for a crime [he] did not commit" because Willie had fired the shots during the drive-by "near 107th Street." Willie told Young that "Cornelius, Dewayne and Germaine" were also in the car. Young said that she did not immediately come forward with this information because Willie led her to believe that this evidence had already been presented at defendant's trial "so there was nothing [she] could do." After learning that this evidence was not introduced at defendant's trial, Young met with defendant's attorney on February 19, 2000. Young's affidavit appears to have been prepared in 2000, but it was not notarized until January 3, 2006.

¶ 36    The third affidavit came from Rayetta Felton, who knew defendant because her sons grew up in the same neighborhood as defendant. Felton said that, at the time of defendant's arrest and conviction, she did not know anything about the facts of the case. Felton said that, "about a year ago," she had a conversation with Germaine Bledsoe when Bledsoe came to her house to see one of her sons. Bledsoe mentioned that "it was too bad [that defendant] was in prison because [defendant] was not the shooter." Bledsoe said he knew this because he was driving the car from which the shots were fired, and that "Willie, Cornelius, and DeShawn" were also in the car. According to Felton, Bledsoe did not say who fired the shots, but he did say that defendant was not present. On February 13, 2000, Felton met with defendant's attorney and told him about her

conversation with Bledsoe. Defendant's attorney then sent Felton a copy of her affidavit to review, which she did. Again, Felton's affidavit appeared to have been drafted in 2000. But it was not signed and notarized until January 3, 2006.

¶ 37    The fourth affidavit was from Aisha Daily, who lived in the same neighborhood as defendant. She first contacted defendant in 1999 and then started asking around the neighborhood about Willie and Germaine. Daily said that, in 2001, Willie came to her house and spoke to her about the case. He said that "he was the actual shooter and that [defendant] was not involved." Daily contacted defendant's lawyer, and he said that he would get an affidavit from her. After that conversation, however, defendant's attorney never contacted Daily about obtaining her affidavit. Daily attested that, on an unspecified date, Willie came to her house again and told her that he wanted to confess to defendant's attorney. Daily brought Willie to defendant's attorney, but he "did not confess." Daily's signature on the affidavit was dated January 9, 2005, but it was notarized on January 8, 2006.

¶ 38    We would make two notes about these affidavits. First, Andrea Young, Rayetta Felton, and Aisha Daily each swore in their affidavits that they met with postconviction counsel about their testimony, which is consistent with what postconviction counsel told the court the first time he discussed the absence of supporting affidavits: that he had previously been in touch with three witnesses who would provide him statements, but he had to file an unsupported petition because the limitations period on filing the petition was about to run. See *supra* ¶ 26. The State does not dispute this fact and even points out that the affidavits of Young and Felton appear to have been originally prepared back in 2000, during their initial meeting with postconviction counsel.

¶ 39    Second, the affidavits of Grace Warren and Aisha Daily, each of whom claim that they brought Willie Madlock to the office of defendant's postconviction counsel to confess his guilt, are

consistent with what defendant's postconviction counsel told the court during the initial postconviction hearing, when defendant asked for new counsel—that a man who had purportedly been willing to confess was brought to counsel's law office, but he ultimately refused to confess. *Supra* ¶ 29. The State agrees that "the visit with Madlock to [defendant's] attorney that is described by Ms. Warren is undoubtedly the same visit that [postconviction counsel] described on the record in the first postconviction proceeding."

¶ 40    On March 3, 2009, the trial court denied defendant leave to file his successive postconviction petition. The court found that the affidavits used to support defendant's claim were not new because defendant "already presented the theory at trial that Willie Madlock was the 'real' shooter and that [defendant] was not in the vehicle when the crime occurred." Thus, the court ruled, "these affidavits [were] cumulative and immaterial in nature and would not change the verdict on retrial." Defendant appeals from the trial court's order.

¶ 41                                    II. ANALYSIS

¶ 42    Defendant argues that the trial court erred in denying him leave to file because he stated a colorable claim of actual innocence. In a supplemental brief filed after the Illinois Supreme Court's first remand in 2012, defendant also argues that he established cause and prejudice justifying his leave to file a successive petition, because his attorney performed inadequately during his initial postconviction proceedings, and that his mandatory life without parole sentence is unconstitutional.

¶ 43    We begin by addressing the constitutionality of defendant's sentence.

¶ 44                        A. Mandatory Life Without Parole Sentence

¶ 45    In *Miller*, the United States Supreme Court held that mandatory life sentences without the possibility of parole for offenders under 18 violate the eighth amendment's prohibition of cruel and

unusual punishment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. The Court wrote that juveniles "are constitutionally different from adults for purposes of sentencing" because they lack adults' sense of responsibility, they are more susceptible to negative influence and outside pressure, and they possess a greater capacity to change their character. *Id.* at ___, 132 S. Ct. at 2464. Thus, juvenile offenders are both less culpable than adults and possess a greater capacity to reform. *Id.* at ___, 132 S. Ct. at 2464. Because mandatory life without parole sentences fail to acknowledge these characteristics, the Court held that they do not serve any justifiable penological purpose. *Id.* at ___, 132 S. Ct. at 2465. The Court held that, at sentencing, trial courts must have the opportunity to consider a juvenile defendant's "age and the wealth of characteristics and circumstances attendant to it." *Id.* at ___, 132 S. Ct. at 2467.

¶ 46    In *Davis*, the Illinois Supreme Court held that *Miller* applied retroactively to cases pending on collateral review at the time *Miller* was decided. *Davis*, 2014 IL 115595, ¶¶ 34-43. The court reasoned that *Miller* effected a substantive change in the law by prohibiting mandatory life without parole sentences for juveniles, exempting it from the general bar on the retroactive application of new rules to final convictions. *Id.* ¶¶ 36-39, 41. Thus, the court held that the defendant, who had raised the constitutionality of his sentence in a successive postconviction petition, was entitled to a new sentencing hearing "where the trial court [could] consider all permissible sentences." *Id.* ¶¶ 9, 43.

¶ 47    Here, the trial court was required to sentence defendant, who was 17 years old at the time of the shooting, to natural life in prison without the possibility of parole because he had previously been convicted of first-degree murder. See 730 ILCS 5/5-8-1(a)(1)(c)(i), (v) (West 1994) (mandating a natural life sentence for defendants twice-convicted of first-degree murder); 730 ILCS 5/3-3-3(d) (West 1994) (precluding parole for defendants sentenced to natural life). Pursuant

to *Miller*, defendant's sentence violated his eighth amendment right to be free from cruel and unusual punishment. Like *Davis*, this appeal was pending at the time *Miller* was decided. In light of the holding of *Davis*, defendant is entitled to be resentenced.

¶ 48     There is no procedural bar to defendant's challenge. As the court explained in *Davis*, *Miller* itself satisfies the cause-and-prejudice standard for successive petitions because *Miller* was not available for earlier postconviction proceedings, and it applied retroactively to defendant's sentencing hearing. *Davis*, 2014 IL 115595, ¶ 42. Moreover, a challenge to the constitutionality of a sentencing statute may be raised at any time (*People v. McCarty*, 223 Ill. 2d 109, 123 (2006)), including on appeal from a collateral proceeding. See, *e.g.*, *People v. Croom*, 2012 IL App (4th) 100932, ¶¶ 7-8, 10. Thus, the fact that defendant first raised this challenge on appeal from the denial of leave to file his successive postconviction petition does not bar us from granting him relief.[2]

¶ 49     Our conclusion is supported by the Illinois Supreme Court's decision in *People v. Thompson*, 2015 IL 118151. In *Thompson*, the defendant relied on *Miller* to challenge the constitutionality of his sentence in an untimely section 2-1401 petition. *Id.* ¶¶ 14-15, 17. The supreme court found that the defendant could not raise his untimely challenge simply because he asserted that his sentence was unconstitutional and void. *Id.* ¶ 30. The court distinguished the defendant's challenge from two appellate court cases (*People v. Luciano*, 2013 IL App (2d) 110792, ¶ 46, and *People v. Morfin*, 2012 IL App (1st) 103568, ¶¶ 25, 56) that permitted minors to raise *Miller* challenges for the first time on appeal from the dismissal of their collateral

---

[2] The State cites *People v. Gray*, 2015 IL App (1st) 112572-B, for the proposition that defendant's sentence may not be challenged for the first time on appeal from the dismissal of a successive postconviction petition. But during the pendency of this case that opinion was withdrawn. Thus, we do not consider *Gray* in reaching our conclusion.

proceedings. *Thompson*, 2015 IL 118151, ¶ 41. The supreme court noted that "[t]he holdings of *Luciano* and *Morfin* are consistent with [its] recent decision in \*\*\* *Davis*, 2014 IL 115595." *Thompson*, 2015 IL 118151, ¶ 42. But, the court said, because the defendant was 19 years old at the time of his offense (*i.e.*, not a minor under *Miller*) he could not "obtain the same collateral relief afforded the defendants in *Luciano*, *Morfin*, and *Davis*." *Id.* ¶ 43.

¶ 50    Unlike the defendant in *Thompson*, defendant was indisputably a minor at the time of his offense, and thus subject to the holdings of *Miller* and *Davis*. Thus, defendant should be able to raise his challenge for the first time on appeal like the defendants in *Luciano* and *Morfin*, cases that the supreme court in *Thompson* said were "consistent with" *Davis* (*id.* ¶ 42), the very case that our supreme court required us to reconsider on remand.

¶ 51    Because defendant's sentence is unconstitutional, he is entitled to a new sentencing hearing. There is no need for further postconviction proceedings on this issue. Accordingly, we vacate defendant's sentence and remand for a new sentencing hearing, where the trial court may consider any permissible sentence. See *Davis*, 2014 IL 115595, ¶ 43 (remanding for resentencing).

¶ 52               B. Defendant's Successive Postconviction Petition

¶ 53    We now turn to the trial court's denial of leave to file defendant's successive postconviction petition based on actual innocence. See 725 ILCS 5/122-1(f) (West 2008) (successive postconviction petition may be filed only with leave of court).

¶ 54               1. The Illinois Supreme Court's Mandate

¶ 55    Before reaching the merits of defendant's actual-innocence claim, it is necessary to address the State's and the dissent's contention that we cannot address the trial court's denial of leave to file the successive postconviction petition, because to do so would be to exceed the scope of the mandate of our supreme court on remand. According to the State and the dissent, because the

supreme court directed us to vacate our original judgment and reconsider it in light of *Davis*, this court may *only* address the sentencing issue and otherwise may not deviate at all from our previous decision in *Warren*, 2013 IL App (1st) 090884-U. The State additionally claims that our prior decision regarding the trial court's denial of leave to file defendant's successive petition is now the law of the case, to which we must adhere.

¶ 56   In its supervisory order, the supreme court denied the petition for leave to appeal and directed this court to "vacate" our prior judgment in *Warren*, 2013 IL App (1st) 090884-U, and to reconsider it in light of *Davis*. We have done both things required of us; we have vacated our previous judgment, and we reconsidered the sentencing issue in light of *Davis*. But there was more than the sentencing issue in our previous judgment; we also ruled on the circuit court's denial of leave to file defendant's successive postconviction petition based on actual innocence. We must rule on that actual-innocence issue in this opinion, too, or there will be no final judgment on that question. See *Flavell v. Ripley*, 247 Ill. App. 3d 842, 847 (1993) ("Where a judgment order is vacated, the effect is to leave the pleadings as if no judgment were ever entered."); *Kelch v. Watson*, 237 Ill. App. 3d 875, 877 (1992) ("The effect of a vacated order is that of a void order.").

¶ 57   Indeed, the authoritative source on which the dissent relies for the notion that we may not reconsider the actual-innocence issue on remand, the Style Manual for the Supreme and Appellate Courts of Illinois, provides that on remand from a supervisory order, our opinion "is not a modified or revised one but simply a *new opinion* and is given a new filing date." (Emphasis added.) Style Manual for the Supreme and Appellate Courts of Illinois § I(G)(3) at (4th ed. rev. 2012). That is precisely why we must consider *all* of the issues on appeal—we are issuing a new opinion, not simply modifying or revising the prior order entered in this case.

¶ 58    The question becomes how this court should rule on that actual-innocence issue. One way to do so, to be sure, would be to merely reference our previous Rule 23 order on that issue. The Style Manual provides that, in issuing a new opinion following a supervisory order, "[i]t is permissible, and based upon the context often desired, for the new opinion to reference the previously filed opinion and rely upon holdings therein to the extent doing so does not conflict with the supreme court remandment order." Style Manual for the Supreme and Appellate Courts of Illinois § I(G)(3), at 17 (4th ed. rev. 2012). That would be the path of least resistance, to follow that "permissible" and even "desired" course of action and merely adopt and incorporate by reference our previous holding on the actual-innocence issue in *Warren*, 2013 IL App (1st) 090884-U, in our opinion and judgment today.

¶ 59    The problem is that a majority of this appellate panel no longer concurs with that holding. The previous judgment of this court affirmed the denial of leave to file the successive postconviction petition by a vote of 2 to 1. See *id.* ¶ 61 (affirming denial of leave to file); *id.* ¶¶ 63-77 (Gordon, J., dissenting). The currently composed panel hearing this matter, by a vote of 2 to 1, would vote to *reverse* the denial of leave to file the successive postconviction petition and remand for further proceedings.

¶ 60    So the question is whether this court is *required* to adhere to its previous holding and judgment on the actual-innocence issue, even where a majority of the panel no longer agrees with it. Obviously, if the supreme court told us to do so, we would do so without hesitation. But the supervisory order gave this court no specific direction on the actual-innocence issue. It gave us direction on the sentencing issue but otherwise denied the petition for leave to appeal, which our supreme court has made clear is *not* a ruling on the merits: "It is well settled that [the supreme court's] denials of leave to appeal are not decisions on the merits of the case" and they " 'carry no

connotation of approval or disapproval of appellate court action, and signify only that four members of the court, for reasons satisfactory to them, have not voted to grant leave.' " *People v. Ortiz*, 196 Ill. 2d 236, 257 (2001) (quoting *People v. Vance*, 76 Ill. 2d 171, 183 (1979)). We can read absolutely nothing into the denial of leave to appeal other than the fact that the supreme court denied leave to appeal. In its supervisory order, the supreme court has given us clear direction on how to reconsider the sentencing issue but has given us no hint of approval or disapproval of, much less direction on how to reconsider, the actual-innocence issue.

¶ 61    The dissent suggests that we are forbidden from departing from our prior decision on the actual-innocence issue in *Warren*, 2013 IL App (1st) 090884-U, that the only result we can reach is affirmance of the denial of leave, regardless of how many judges on this panel would now vote to reverse. But the dissent's authoritative source for this contention, the Style Manual, only says that incorporating by reference holdings of the previous opinion is "permissible" or, in the proper context, even "desired"—language that is not mandatory. And the case the dissent quotes, *People ex rel. Birkett v. Bakalis*, 196 Ill. 2d 510, 512 (2001), merely describes the Illinois Supreme Court's general practice of using supervisory orders when one of its opinions "appears to be dispositive of other cases pending before [the supreme court] on petitions for leave to appeal." The supreme court did not take up the issue of the scope of a supervisory order such as the one in this case; the issue in *Bakalis* was whether the State could seek a supervisory order to vacate a trial court order regarding a criminal defendant's ability to take certain depositions. *Id.*

¶ 62    Ultimately, the dissent's reasoning rests on the same faulty assumption as the State's: that, when the supreme court told us to vacate our prior judgment and reconsider this case in light of *Davis*, it tacitly signaled its *approval* of every other issue besides the sentencing issue. But this court simply cannot interpret the supreme court's denial of leave to appeal as some kind of implicit

affirmance, an inference the supreme court has rejected in no uncertain terms. *Ortiz*, 196 Ill. 2d at 257.

¶ 63　When the supreme court ordered us to vacate our previous judgment, it obviously understood that this court would be required to issue a new opinion and enter a new judgment on *all* issues, even on those that were not addressed specifically in the supervisory order. There is nothing in the supervisory order foreclosing the possibility that the appellate panel might decide to reach a different outcome on one of those other issues, for whatever reason—a new composition of judges on the panel; new case law that persuades us we made a mistake the last time around; or even just a change of one or more judges' minds, upon further reflection.

¶ 64　Neither the dissent nor the State cites any decision holding that a judge, with jurisdiction over the matter and no specific direction from a higher court on the issue, lacks the inherent ability to change his or her mind about an issue upon further reflection. The case law has always held the exact opposite. See, *e.g.*, *People v. Mink*, 141 Ill. 2d 163, 171 (1990) ("A court in a criminal case has inherent power to reconsider and correct its own rulings, even in the absence of a statute or rule granting it such authority."); *People v. Van Cleve*, 89 Ill. 2d 298, 304 (1982) ("[A] court possesses inherent power to correct its interlocutory rulings."); *Stevens v. Village of Oak Brook*, 2013 IL App (2d) 120456, ¶ 37 ("A court has the inherent authority to reconsider and correct its rulings, and this power extends to interlocutory rulings as well as to final judgments."); *Geske v. Geske*, 343 Ill. App. 3d 881, 885 (2003) ("It would be absurd to suppose that trial judges who conclude they have made mistakes should not be free to correct them within an appropriate time frame.").

¶ 65　The dissent also notes that the supreme court instructed us to vacate our "judgment," not our "decision," suggesting that the prior order disposing of this case is binding on every issue except the sentencing issue. But without a judgment, a decision has no resolution; it does not fix

the rights of the parties. See *In re D.D.*, 212 Ill. 2d 410, 418 (2004) ("A final judgment is defined as one that fixes the rights of the parties in the lawsuit; it is final if it determines the litigation on the merits and, if affirmed, leaves only the execution of the judgment."); Black's Law Dictionary 846 (7th ed. 1999) (defining "judgment" as "[a] court's final determination of the rights and obligations of the parties in a case"). While our prior decision remains, it has no binding effect on the parties, and they are left with no resolution of the actual-innocence issue. We fail to see how, absent a "judgment" giving effect to our prior decision, the "decision" has any bearing on our reconsideration of the case.

¶ 66    To be clear: There is no question that this Court is required to follow the mandate of the supervisory order. The case law cited by the dissent, in essence, says nothing more than that. It is no doubt a correct proposition of law. By vacating the previous judgment, we are complying with the mandate. By reconsidering the sentencing issue in light of *Davis*, we are complying with the mandate. By ruling on the actual-innocence issue, we are doing something we have no choice but to do—issuing a ruling and entering judgment on an issue pending in the case. And by deciding to reach a different outcome on that actual-innocence issue than we did previously, we are doing nothing inconsistent with the mandate.

¶ 67    The State's objection to our doing so, based on the law-of-the-case doctrine, is likewise incorrect. The law-of-the-case doctrine only applies when there is a "final judgment" on an issue. *People v. Patterson*, 154 Ill. 2d 414, 469 (1992). As explained above, there is no final judgment on defendant's successive petition, now that we have vacated our previous judgment. And in any event, the law-of-the-case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided; it is not a limit on their power." *Id.* at 468-69. Thus, the

law-of-the-case doctrine would not strip us of our authority to reconsider these issues, even if a final judgment were in effect—which, again, is not the case.

¶ 68    For all of these reasons, it is appropriate for this court to consider the merits of the actual innocence issue and to reach whatever decision, and enter any judgment, that we deem appropriate based on the law and the facts before us.

¶ 69                                    2. Defendant's Actual-Innocence Claim

¶ 70    The Post-Conviction Hearing Act (the Act) provides that, generally, a defendant may only file one postconviction petition. 725 ILCS 5/122-1(f) (West 2008). In order to file a successive postconviction petition, a petitioner must first obtain "leave of court." *Edwards*, 2012 IL 111711, ¶ 24. One way a petitioner may obtain leave of court is by raising a colorable claim of actual innocence. *Id.* When a petitioner seeks leave of court based on a claim of actual innocence, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.*

¶ 71    We turn first to the appropriate standard of review. Defendant asks us to apply *de novo* review to the issue of whether he presented a colorable claim of actual innocence. In the State's opening brief, it also states that *de novo* review is proper. But since those briefs were filed, our supreme court has suggested that two different standards of review may be possible. In *Edwards*, the court, after establishing that a petitioner could obtain leave of court by presenting a colorable claim of actual innocence, turned to the issue of the appropriate standard of review, an issue that "was briefed only minimally" in the supreme court. *Id.* ¶ 30. While noting that, "[g]enerally, decisions granting or denying 'leave of court' are reviewed for an abuse of discretion," the court

noted that the question before it was whether "as a matter of law, no colorable claim of actual innocence ha[d] been asserted." *Id.*

¶ 72    As the court in *Edwards* noted, the question here is whether the pleadings, taken as true, are sufficient "as a matter of law" to establish a claim of actual innocence. *Id.* ¶ 30. Necessarily, this is a legal question, to which *de novo* review is appropriate. See, *e.g.*, *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 32 (ruling that movant was entitled to judgment "as a matter of law" was reviewed *de novo*); *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 254 (2004) (*de novo* review applies to whether dismissal of pleadings was "proper as a matter of law"). In this case, the trial court heard no live testimony and made its decision based solely on the same pleadings that are before us. And if petitioner stated a colorable claim of actual innocence as a matter of law, the trial court was *required* to grant him leave to file his successive petition; there were no other matters left to the trial court's discretion. We see no determination by the trial court that demands deference. Instead, we find that the decision on granting leave is akin to a decision whether to dismiss a postconviction petition, which likewise considers the legal sufficiency of the allegations, taken as true and liberally construed—and which requires *de novo* review. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998).

¶ 73    Notably, since *Edwards* questioned the appropriate standard of review, some decisions of this court have applied *de novo* review to the question of whether a successive petition can state a colorable claim of actual innocence. See, *e.g.*, *People v. Adams*, 2013 IL App (1st) 111081, ¶ 30 (applying *de novo* review to decision of whether petitioner stated colorable claim of actual innocence); *People v. Green*, 2012 IL App (4th) 101034, ¶ 30 (*de novo* review appropriate because "[t]he trial court *** dismissed defendant's second successive petition without finding facts" (internal quotation marks omitted)). Other decisions have declined to reach the issue of the

standard of review because the petitioner's claim would fail under either standard. See, *e.g.*, *People v. Simon*, 2014 IL App (1st) 130567, ¶ 58. But we have found no decision applying an abuse of discretion standard.

¶ 74 Moreover, we note that, when a petitioner seeks leave of court via the cause-and-prejudice standard, we apply *de novo* review. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002); *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25. We see no reason why cases alleging actual innocence should be reviewed under a more deferential standard, when the ultimate question—the propriety of leave of court—is the same.

¶ 75 For all of these reasons, we apply *de novo* review to the denial of leave to file defendant's successive postconviction petition.

¶ 76 To establish a claim of actual innocence, the evidence supporting defendant's claim must have been: (1) newly discovered, (2) material and not merely cumulative, and (3) of such a conclusive character that it would probably change the result at a retrial. *Edwards*, 2012 IL 111711, ¶ 32. At the initial stage of the proceedings, where the defendant seeks leave to file the successive petition, a defendant is not required to conclusively prove his case. Rather, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* ¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

¶ 77 At this stage of the proceeding, we take as true all well-pleaded facts in defendant's successive petition. *Pitsonbarger*, 205 Ill. 2d at 467; *People v. Williams*, 392 Ill. App. 3d 359, 367

(2009). Credibility determinations are inappropriate at this stage; as our supreme court recently reminded us, "[c]redibility determinations may be made only at a third-stage evidentiary hearing" of a successive postconviction proceeding. *People v. Sanders*, 2016 IL 118123, ¶ 42; see also *Coleman*, 183 Ill. 2d at 390-91 (noting that "factual and credibility determinations will be made at the evidentiary stage of the [initial] post-conviction proceeding").

¶ 78    We now turn to each of the elements of the actual-innocence claim, though not in the traditional order of consideration.

¶ 79                              a. *Material and Not Cumulative*

¶ 80    We first conclude that defendant has satisfied the requirement that the proffered evidence be material and noncumulative. Material evidence is evidence that "is relevant and probative of the petitioner's innocence." *People v. Coleman*, 2013 IL 113307, ¶ 96. Each of the affidavits recounted conversations with Madlock and Bledsoe in which they said that Madlock shot Higgins while Bledsoe was driving. Moreover, Madlock and Bledsoe said that defendant was not present for the shooting. Clearly, this information is relevant to, and probative of, defendant's innocence.

¶ 81    The affidavits also presented evidence that was not cumulative of the evidence presented at trial. Evidence is considered cumulative if it "adds nothing" to what the jury heard at trial. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). There was no evidence at trial that either Madlock or Bledsoe had confessed to Higgins's murder. While Dejuan Jones testified that Madlock shot Higgins from a car that Bledsoe drove, and that defendant was not present for the shooting, evidence that Madlock and Bledsoe later *confessed* to these facts would add something to the evidence the jury heard. This evidence certainly would have corroborated Jones's account of the shooting and defendant's alibi evidence, but that does not mean it would have added nothing to defendant's trial. Corroborative evidence is not the same as cumulative evidence. See, *e.g.*, *People v. Molstad*, 101

Ill. 2d 128, 135 (1984) (evidence corroborating defendant's alibi was not cumulative); *People v. Sparks*, 393 Ill. App. 3d 878, 886 (2009) (eyewitness testimony corroborating defendant's version of events was not cumulative).

¶ 82                                b. *Likely to Change the Result on Retrial*

¶ 83    Next, we turn to the question of whether the evidence supporting defendant's claim is "of such conclusive character" that it would "probably change the result on retrial." (Internal quotation marks omitted.) *Coleman*, 2013 IL 113307, ¶ 84. In other words, defendant's evidence must "raise[ ] the probability that it is more likely than not that no reasonable juror would have convicted him." (Internal quotation marks omitted.) *Edwards*, 2012 IL 111711, ¶ 24.

¶ 84    Assuming the truth of the evidence included in the four affidavits, we find that they are sufficient to raise the probability that it is likely that no reasonable juror would convict defendant. As we mentioned above, this evidence would provide critical corroboration for both Jones's account of the shooting and defendant's alibi evidence. Each of the potential witnesses would testify that, after defendant's conviction, Madlock and Bledsoe confessed that defendant was not the shooter, and that Madlock shot Higgins while Bledsoe drove the car. The addition of four witnesses, whose testimony we presume to be true, to corroborate defendant's theory of the case would likely result in a different outcome at trial. Moreover, evidence of Madlock's and Bledsoe's confessions would be exonerating and would contradict Jackson's and Stampley's testimony identifying defendant as the shooter. See *Adams*, 2013 IL App (1st) 111081, ¶ 36 ("Where the statement of a witness is both exonerating and contradicts a State witness, it can be capable of producing a different outcome on retrial."). In light of the strong support that the new evidence would provide to defendant's case—if in fact, it is true, as we must presume at this stage—it likely would change the result of the trial.

¶ 85     Moreover, we note that the State's principal evidence consisted of two eyewitness identifications from Jackson and Stampley. Those identifications were made during less than ideal circumstances: Jackson and Stampley had to take cover from the hail of gunfire coming from the surprise attack behind them, shortening the time they had to view the shooter. The State presented no identifications from the other individuals present for the shooting, including Omar Muhammad, who testified that he did not have an opportunity to see the shooter before he had to seek cover. This is not to say that the State's evidence was insufficient; we simply find that it was not so strong that we can say that the addition of evidence that Madlock's and Bledsoe's confessions would not likely change the result of a new trial.

¶ 86     While the presence of defendant's fingerprints on the Buick undermined his alibi, there was no evidence establishing when defendant left those prints. Of the numerous other prints recovered from other locations in the car, none matched defendant's prints. And defendant's print was recovered from the rear, passenger-side window of the car, whereas Jackson and Stampley said that defendant was in the front, passenger seat during the shooting. Thus, the fingerprint evidence does not mean that defendant's new evidence would be unlikely to change the result on retrial, especially where we presume the truth of that evidence.

¶ 87     The dissent contends that, because the evidence presented in the affidavits would simply contradict the State's evidence at trial, they are not of such a conclusive character that they would change the result on retrial. The dissent cites *Sanders*, 2016 IL 118123, to support that contention. But in *Sanders*, the court did not say that evidence that conflicts with the evidence at trial could never support a claim of actual innocence. Our supreme court has made it clear that evidence contradicting the State's evidence can, in certain cases, be likely to change the result on retrial. See, *e.g.*, *Ortiz*, 235 Ill. 2d at 337 (evidence likely to change result where it "directly contradict[ed] the

recanted testimony of the two prosecution witnesses"). Instead, the court in *Sanders* simply found that the new evidence *in that case* was unlikely to change the result on retrial. In *Sanders*, the testimony offered to support the successive petition was a recantation from one of the State's witnesses at trial. *Sanders*, 2016 IL 118123, ¶ 48. That recantation conflicted with the physical evidence presented at trial and with defendant's other witnesses who said that defendant was present for events preceding the murder. *Id.* ¶ 52. It was for those reasons that the court concluded "that the recantation is not of such conclusive character as would probably change the result on retrial." *Id.* Here, the testimony of Warren, Young, Felton, and Daily would corroborate the testimony of Dejuan Jones, as well as defendant's alibi evidence. And it would not conflict with any physical evidence presented at trial. Thus, *Sanders* does not support the dissent's position.[3]

¶ 88    Of course, we acknowledge that the evidence in the affidavits is problematic because it is hearsay. Generally, hearsay affidavits cannot be used to support postconviction claims. *People v. Morales*, 339 Ill. App. 3d 554, 565 (2003). But the Illinois Supreme Court has held that this rule should not be applied "inflexibly." *People v. Sanchez*, 115 Ill. 2d 238, 284 (1986).

¶ 89    For example, in *Sanchez*, the defendant, who had been convicted of murder, filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, ¶ 2-1401). *Sanchez*, 115 Ill. 2d at 283. In support of his petition, the defendant attached an affidavit from an investigator, which said that he took a statement from a witness who

---

[3] The dissent also writes, "Contrary to the majority's opinion, we can, without making any credibility determinations, conduct a *de novo* review comparing the new proffered evidence and the evidence presented at trial, and decide whether the new evidence is of such a conclusive character that the outcome of defendant's trial would have been different." *Infra* ¶ 220. Nowhere in our opinion have we suggested that this analysis cannot be conducted. In fact, it is precisely the inquiry that we have undertaken above. While the dissent may disagree with the conclusion we have reached in conducting that analysis, it is inaccurate to say that we have not conducted it, or that we have said such an analysis is impossible.

claimed that the defendant was not among the group of men who had abducted and murdered the victim. *Id.* The affidavit stated that the witness would invoke his right against self-incrimination if called to testify. *Id.* at 284. On appeal, the supreme court noted that, ordinarily, a hearsay affidavit would be insufficient to warrant an evidentiary hearing. *Id.* But the court, noting that the defendant had been sentenced to death and that "procedural fairness and factual accuracy are of paramount importance" in such a case, held that an evidentiary hearing on the defendant's petition was necessary. *Id.* The court looked to the "reasoning" behind the exception to the bar on hearsay affidavits in Illinois Supreme Court Rule 191(b) (eff. July 1, 1982), which said that hearsay affidavits could support a motion for summary judgment where the affidavit contained " 'material facts' " that were known only to the declarant, and the party seeking summary judgment could not obtain an affidavit from the declarant " 'by reason of hostility or otherwise.' " *Sanchez*, 115 Ill. 2d at 285 (quoting Ill. S. Ct. R. 191(b) (eff. July 1, 1982)). The court noted that, in the case before it, the affidavit contained "material facts" that the defendant could not otherwise present because the witness intended to invoke his right against self-incrimination. *Sanchez*, 115 Ill. 2d at 285.

¶ 90    The affidavits supporting defendant's petition in this case are similar to the affidavit at issue in *Sanchez*. Each of the four affidavits contained facts material to defendant's innocence: each said that either Madlock himself or Bledsoe admitted that Madlock was the shooter and that defendant was not present.

¶ 91    And the affidavits sufficiently alleged that Madlock and Bledsoe were hostile or unavailable. Both Grace Warren and Daily attested that they brought Madlock to postconviction counsel's office, but that Madlock refused to confess. Young attested that she "believe[d]" that Bledsoe had died. While none of the affidavits expressly stated that Madlock or Young would

invoke their rights against self-incrimination, each of the affidavits alleged facts showing that Madlock would decline to confess and that Bledsoe would be unable to do so. Finally, we note that, although *Sanchez* was a capital case, and this case is not, the stakes are similarly high: defendant, who was a juvenile at the time of the offense, was convicted of first-degree murder and faces severe penalties on resentencing. Thus, the court's concern for procedural fairness and factual accuracy are present here. *Cf. People v. Perkins*, 260 Ill. App. 3d 516, 520 (1994) (declining to apply *Sanchez* in part because case only involved a misdemeanor).

¶ 92    And even though these affidavits contained hearsay, it does not necessarily follow that the affiants' testimony would be inadmissible at trial. Felton's potential testimony about Bledsoe's confession could be admissible under Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), which provides for the admission of an out-of-court statement that would subject the declarant to criminal liability where the declarant is unavailable to testify and "corroborating circumstances clearly indicate the trustworthiness of the statement." Felton's affidavit recounted her conversation with Bledsoe, during which Bledsoe told Felton that he was the driver of the car from which Madlock shot Higgins. If true, this statement would subject Bledsoe to criminal liability. See *People v. Medrano*, 271 Ill. App. 3d 97, 104 (1995) (evidence sufficient to convict defendant of attempted murder under accountability theory where evidence showed that he was driver of car during drive-by shooting). And Young's affidavit stated that she "believe[d]" that Bledsoe is now dead. If that is true, Bledsoe would be unavailable to testify. See *People v. Jones*, 2012 IL App (1st) 093180, ¶¶ 56, 58 (deceased witness is considered unavailable for purposes of hearsay exception).

¶ 93    Moreover, we cannot fully assess the trustworthiness of Felton's possible testimony at this point, nor should we. The supreme court has recently reminded us that the initial stage of a successive postconviction proceeding is not the forum for credibility or reliability determinations.

*Sanders*, 2016 IL 118123, ¶¶ 33, 37. "Credibility determinations may be made only at a third-stage evidentiary hearing." *Id.* ¶ 42; see *United States v. Bagley*, 537 F.2d 162, 168 (5th Cir. 1976) (inquiry into trustworthiness of statement against penal interest should be left to trial judge, who "has the opportunity to judge the credibility of the witness [and] to exercise discretion in determining whether *** the statement is trustworthy"). Thus, we cannot conclusively say that her testimony lacks indicia of trustworthiness at this stage.

¶ 94    But leaving these principles aside, some indicia of trustworthiness are present. Felton's testimony is corroborated by other evidence at trial: Jones testified that Bledsoe was the driver during the shooting, that Madlock was the shooter, and that defendant was not in the car. See *People v. Rice*, 166 Ill. 2d 35, 45 (1995) (looking to presence of corroborating evidence in determining whether statement against interest was trustworthy). And Felton's affidavit disclosed no facts showing that she would have a motive to testify falsely. See *id.* (finding statement against interest to be untrustworthy because declarant "had a motive to testify falsely"). In fact, she said that, although her sons knew defendant, she was not aware that he had been convicted of Higgins's murder until after he was incarcerated and that she "did not know anything about the facts of his case." These statements suggest that Felton was not close with defendant, and would thus have no obvious motive to fabricate her affidavit to favor defendant. Admittedly, Bledsoe did not make this statement shortly after the crime, which cuts against its admission (see *id.*), but the presence of corroborating evidence, the lack of a suspect motive, and our standard of review at this stage all suggest that Bledsoe's confession could possibly be admissible as a statement against penal interest.

¶ 95    With respect to Grace Warren's, Young's, and Daily's affidavits, their testimony could be admissible pursuant to the hearsay exception created by *Chambers v. Mississippi*, 410 U.S. 284

(1973). In *Chambers*, the Court held that due process requires the admission of an out-of-court statement that the declarant, and not the defendant, committed the crime, provided that the trial court finds it to be trustworthy. *Id.* at 302; see also *People v. Bowel*, 111 Ill. 2d 58, 66 (1986) (recognizing *Chambers*). The Court acknowledged that, while such an out-of-court confession would generally be inadmissible hearsay, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302. The Court set out four factors to determine whether such a statement is trustworthy: (1) whether the declaration was made spontaneously, to a close acquaintance, shortly after the crime occurred; (2) whether it was corroborated by other evidence; (3) whether it was self-incriminating and against the declarant's penal interest; and (4) whether there was an adequate opportunity for the State to cross-examine the declarant. *Chambers*, 410 U.S. at 300-01. The presence or absence of any one factor is not determinative; rather, the trial court should consider whether the statements were made under circumstances demonstrating their trustworthiness. *Bowel*, 111 Ill. 2d at 67-68.

¶ 96    Again, we must take the affidavits supporting defendant's petition as true, without any credibility determinations at this stage. *Pitsonbarger*, 205 Ill. 2d at 455. Our supreme court has firmly *rejected* a State argument that "a threshold finding of trustworthiness must be made before a court may determine whether a postconviction petitioner has set forth a colorable claim of actual innocence." *Sanders*, 2016 IL 118123, ¶ 32. Trustworthiness and reliability determinations may be made only at a third-stage evidentiary hearing. *Id.* ¶ 42. Thus, we cannot imagine how we could find, as a matter of law, at this initial stage of the postconviction proceeding, that these three affidavits are so inherently untrustworthy that they would be inadmissible under *Chambers*.

¶ 97    The dissent claims that our analysis of these affidavits is faulty because the testimony in the affidavits is less reliable than the testimony in *Chambers* or *People v. Tenney*, 205 Ill. 2d 411

(2002), meaning that they would be inadmissible. But the dissent ignores the fact that neither *Chambers* nor *Tenney* involved a postconviction petition at the pleading stage, where we assume the truth of all well-pleaded facts. *Pitsonbarger*, 205 Ill. 2d at 455, 467. Both *Chambers* and *Tenney* dealt with the admission of out-of-court confessions *at trial*, where the trial court had the opportunity to assess the credibility and trustworthiness of the proffered hearsay testimony. *Chambers*, 410 U.S. at 289; *Tenney*, 205 Ill. 2d at 431-32. All that our opinion suggests is that the trial court undertake a complete *Chambers* analysis before we do; the same analysis that the trial courts were able to perform in *Chambers* and *Tenney*. At this first stage of postconviction proceedings, it is neither appropriate nor advisable for us to adjudicate the trustworthiness of this evidence. *Sanders*, 2016 IL 118123, ¶¶ 33, 37.

¶ 98    But leaving that aside, Grace Warren's, Young's, and Daily's affidavits meet at least two—and possibly three—of the *Chambers* factors. The first factor is not met, as none of the affidavits show that Grace Warren, Young, or Daily were close acquaintances of Madlock, or that Madlock confessed shortly after the crime. Indeed, the affidavits show that Madlock confessed well after the crime occurred, as he did not come forward until defendant had already been sent to prison. But the second and third *Chambers* factors appear to be satisfied. Assuming the truth of the affidavits, they are corroborated by Jones's trial testimony, as Jones testified that Madlock was the shooter and that defendant was not in the car at the time of the shooting. They were also certainly against Madlock's penal interest. Thus, the hearsay statements could be admissible under the *Chambers* exception, provided that the trial court ultimately found them to be trustworthy.

¶ 99    Of course, none of this is to say that the trial court may not ultimately conclude that Grace Warren, Andrea Young, Rayetta Felton, and Aisha Daily are not trustworthy and that their testimony would be inadmissible at a new trial. But we lack the capacity to fully assess their

credibility and must presume the truth of their affidavits unless they are affirmatively refuted by the record. *Sanders*, 2016 IL 118123, ¶ 32; *Pitsonbarger*, 205 Ill. 2d at 455, 467; *Williams*, 392 Ill. App. 3d at 370-71. We leave questions regarding these witnesses' credibility to future postconviction proceedings, where the trial court can more fully evaluate the trustworthiness of this evidence.

¶ 100 The State cites *Morales* in support of its argument that the affidavits cannot support defendant's claims, because they are inadmissible hearsay. In *Morales*, the defendant filed a successive petition alleging that he was innocent, supported by six affidavits. *Morales*, 339 Ill. App. 3d at 558-59. One of those affidavits was from one of the defendant's codefendants, who pleaded guilty in exchange for his testifying against the defendant at trial. *Id.* at 557, 558. In that affidavit, the codefendant recanted his trial testimony and said that the defendant was not the shooter. *Id.* at 558. Three of the affidavits came from individuals incarcerated at the same facility as the defendant, who said that one of the victims of the shooting had recanted his identification of the defendant to them. *Id.* at 556-57, 558-59. The fifth affidavit came from an individual who was also incarcerated, but not at the same facility as the defendant. *Id.* at 558-59. This affidavit simply said that, to the best of the affiant's knowledge, the defendant was not guilty. *Id.* The final affidavit was from a witness who said that another person confessed to the crime. *Id.* at 558. The court held that these affidavits were insufficient to support the defendant's actual-innocence claim. *Id.* at 564-65.

¶ 101 The appellate court noted that the codefendant's recantation was "suspect," citing the general proposition that prisoners often use threats to obtain " 'jail house' " affidavits, as well as the fact that the codefendant's signature looked different on his affidavit than it did on other documents. *Id.* at 564. The court also noted that four of the affidavits contained hearsay, that four

of the affidavits were from other inmates, and that two of them were "simply unpersuasive." *Id.* at 565. Thus, the court concluded that the witnesses "were not credible" and that the affidavits were not "sufficiently conclusive" to support the defendant's claim. *Id.*

¶ 102 *Morales* is not persuasive here. As our supreme court has stressed, credibility determinations should not be made at postconviction pleading stages. *Sanders*, 2016 IL 118123, ¶¶ 33, 37, 42; *Coleman*, 183 Ill. 2d at 390-91. Thus, the court's conclusion in *Morales* that certain affidavits were inherently suspect or incredible runs counter to firmly established postconviction principles. See, *e.g.*, *Sanders*, 2016 IL 118123, ¶¶ 33, 37 (rejecting notion that affidavits containing recantation testimony should be considered inherently unreliable at second-stage proceedings).

¶ 103 And leaving that aside, the affidavits in this case do not resemble the affidavits in *Morales*. Unlike the affidavits in *Morales*, these affidavits are not insufficiently conclusive: each recounted details about the affiants' conversations with Madlock and Bledsoe, including how each affiant was familiar with them, and said that Madlock and Bledsoe consistently said that defendant was not present for the shooting. Moreover, in *Morales*, there was evidence at trial that the defendant had tried to convince a witness to lie and say he had an alibi, a fact that is not present in this case. *Morales*, 339 Ill. App. 3d at 557. Finally, in *Morales*, the defendant did not present evidence at trial that anyone else committed the crime, whereas this case involves new evidence that came to light after trial, which, if true, would significantly bolster defendant's trial evidence that Madlock shot Higgins. Thus, we do not find that *Morales* demands that we find that the affidavits in this case are unreliable.[4]

---

[4] Along with *Morales*, the dissent also cites *People v. Brown*, 2014 IL App (1st) 122549, and *People v. Gray*, 2011 IL App (1st) 091689, in support of the notion that the affidavits in this

¶ 104 The State and dissent also claim that, because defendant's attorney was aware of these witnesses during the initial postconviction proceedings, counsel must have concluded that their testimony would be inadmissible because he did not include their affidavits with defendant's initial petition. First, neither the State nor the dissent cite any authority for the proposition that we must defer to counsel's evaluation of the admissibility of evidence. Second, this speculation as to counsel's opinion is refuted by the record. Counsel twice tried to explain the absence of any affidavits during defendant's initial postconviction proceedings. The first time, he said that he did not include the affidavits of Young, Daily, and Felton because the limitations period on filing his postconviction petition was about to run and he lacked time to submit them. The second time, he gave a different explanation altogether, referring to his inability to obtain the affidavits of the people defendant claims are the real perpetrators—Madlock and Bledsoe. But in *neither* instance, even when faced with defendant's accusation that he was not properly investigating his actual-innocence claim, did counsel say that he believed these witnesses' affidavits were unreliable, or that their testimony would be inadmissible.

¶ 105 The dissent argues that none of the affidavits contain sufficient facts that would make a different result on retrial likely. But the dissent's specific arguments with regard to each affidavit do not withstand scrutiny.

---

case could not support defendant's claim because they were hearsay. But neither of the hearsay affidavits in those cases involved statements that were possibly admissible under *Chambers*; to the contrary, they contained hearsay that was not admissible under any exception. See *Brown*, 2014 IL App (1st) 122549, ¶ 58 (defendant completed affidavit stating "that the Assistant State's Attorney informed her lawyer of a 20-year plea offer and that her trial counsel informed her mother and brother of a 20-year plea offer"); *Gray*, 2011 IL App (1st) 091689, ¶ 16 (defendant submitted affidavit from individual who said that witness at trial recanted his trial testimony that he saw the shooting).

¶ 106   The dissent contends that Grace Warren's affidavit would not change the result on retrial because Warren did not say when and where precisely her conversation with Madlock occurred. But the dissent ignores the fact that, while Warren's affidavit does not state the specific date and time of her conversation with Madlock, it is likely that such foundation would be laid if and when she took the stand and was questioned at an evidentiary hearing.

¶ 107   The dissent takes issue with Young's affidavit because, according to the dissent, her testimony is not based on her personal knowledge. But Young's affidavit recounted a conversation she had with Madlock. She certainly had personal knowledge of that conversation, considering that she was one of the parties to it. While she was not present for the shooting, she would not be testifying as to the facts of the shooting—she would be testifying to the facts of Madlock's *confession*.

¶ 108   The dissent also claims that Young's affidavit "contains conclusions, not facts, for example, that Willie knew defendant 'was in prison for a crime [he] didn't commit,' and that defendant 'was innocent.' " *Infra* ¶ 243. But what Young's affidavit actually said was that, "during [the] conversation, *Willie told us* that he knew [defendant] was in prison for a crime [defendant] did not commit," and that "*Willie said that* he knew [defendant] was innocent because Willie was in a car *** when the shots were fired." (Emphases added.) These statements are plainly not conclusions drawn by Young—they are the things that Madlock *said to Young*. Because Young simply recounted the things Madlock said to her, they are *facts*. They are not Young's conclusions regarding defendant's innocence.

¶ 109   With respect to Felton's affidavit, the dissent claims that it "does not state any facts about when the alleged shooting incident occurred," about who the victim was, or "anything about the nature of the offense which could indicate which shooting defendant was 'not present' for" (*infra* ¶

247), suggesting that we cannot even be sure what shooting Felton is talking about without these facts. But Felton's affidavit said that Bledsoe "said it was too bad [defendant] was in prison because he *** knew [defendant] was not the shooter." Defendant is only in prison for one shooting for which Bledsoe was present. And the facts given to Felton by Bledsoe closely track the facts of the shooting recounted by the other affiants and Dejuan Jones's trial testimony. Thus, it is patently obvious which shooting Felton refers to in her affidavit.

¶ 110    Finally, the dissent takes issue with Daily's affidavit because she refers to the individual who confessed to her as "Willie" and not "Willie Madlock." But, once again, context makes plain that she was referring to Willie Madlock. Daily attested that "Willie" spoke to her about defendant's case and admitted that he was the shooter. It is unlikely that another person named "Willie" would confess to the same shooting at the same time that Willie Madlock did. And Daily said that she brought "Willie" to defendant's postconviction attorney to confess, but "Willie" did not. Once again, this tracks with postconviction counsel's on-the-record assertion that Madlock was going to come into his office and confess, but refused to do so. It is not unreasonable to conclude that "Willie" was Willie Madlock. To the contrary, it is the only conclusion that can be drawn when the affidavits are read together and construed in light of the record.

¶ 111    As we have explained, when taking the affidavits as true and avoiding improper credibility determinations, these affidavits support defendant's trial theory and provide substantial evidence that both Madlock and Bledsoe repeatedly confessed to the shooting. We cannot say, at this stage, that such evidence would not change the result at a new trial. Any foundational defects in these affidavits can easily be addressed at the second stage, when defendant has had the benefit of counsel to draft new, more thorough affidavits.

¶ 112    We hold that the affidavits of Young, Daily, Felton, and Warren, taken as true at this initial stage of the postconviction proceedings, are sufficient to raise the probability of a different result on retrial.

¶ 113                                   c. *Newly Discovered Evidence*

¶ 114    Finally, we consider whether this evidence was newly discovered. Our supreme court has defined newly discovered evidence as evidence that has been discovered since the trial, and that the defendant could not have discovered sooner through due diligence. *Ortiz*, 235 Ill. 2d at 334. Typically, evidence of which the defendant was aware in earlier postconviction proceedings will not be considered newly discovered. See *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21 (evidence available at earlier posttrial proceeding was not newly discovered); *People v. English*, 403 Ill. App. 3d 121, 133 (2010) (affidavit of alibi witness, of which defendant was aware when he filed his initial postconviction petition, was not newly discovered).

¶ 115    The State argues that the evidence supporting defendant's successive petition—the four affidavits attesting to the alleged confessions of Madlock and Bledsoe—was not newly discovered because defendant and his postconviction attorney knew of these four witnesses' potential testimony during the first postconviction proceedings, and none of the affidavits suggests that any of the witnesses were unwilling to testify.

¶ 116    The State is correct that the record suggests that defendant and his attorney were well aware of the four affiants' willingness to testify at the initial postconviction proceedings. Each of the affidavits, which we take as true, asserted that the witnesses spoke to defendant's counsel at the time of his initial postconviction proceedings. And defendant's successive petition did not allege that he was unaware of these witnesses or that they were uncooperative. Instead, he merely alleged that he did not receive the affidavits until "late 2006, 2007, and 2008."

¶ 117 But the record, along with defendant's allegations in the successive postconviction petition and the supporting affidavits, show more than that. First, they show not only that these witnesses were willing to submit affidavits at the initial postconviction proceeding, but that defendant went so far as to request new counsel during the initial postconviction proceeding because his counsel "failed to investigate thoroughly and to present evidence that could [have] cleared" him of the crime.

¶ 118 More significantly, the record also reveals no good reason why counsel, at the initial postconviction proceeding, failed to present these affidavits. He knew of the potential affiants, so he had to know that if he did not produce the affidavits at the initial postconviction hearing, he would *never* be able to present them, because he would run up against the very argument the State now puts forth at the successive petition proceedings—that the evidence is no longer newly discovered. There is nothing in the record to indicate that these witnesses were recalcitrant, as even the State concedes; the record, in fact, suggests the complete opposite. Counsel thus had nothing to lose by submitting these affidavits for the court's consideration at the first postconviction proceeding, and *everything* to lose by failing to submit them.

¶ 119 Counsel's stated reason for not doing so holds no water. As we have chronicled above, counsel's first explanation was that he could not get the affidavits of the "three witnesses" (likely Andrea Young, Rayetta Felton, and Aisha Daily) because he had to file defendant's petition before the statute of limitations expired. But the deadline for filing was in 2000, and the hearing on the State's motion to dismiss was in July 2004; counsel did not explain why, in the more than four years while defendant's postconviction petition was pending before the trial court—and the limitations period posed no problem—he did not *amend* the petition to include these affidavits.

¶ 120 His second explanation was a non-sequitur. It came after oral argument on the motion to

dismiss, on the date of the court's ruling, in August 2004. By that time, defendant had filed his *pro se* motion to substitute counsel, claiming that his lawyer failed to adequately investigate and support his actual-innocence claim. When the trial court inquired of counsel about the motion to substitute, defense counsel explained his client's dissatisfaction thusly:

"I think that what he's alluding to is something that came up the last time we were in front of your Honor, which is that there is a witness, two witnesses who for a long period of time, and I mean years, had told family members and friends that they were willing to come in and provide an affidavit with respect to one of the two claims, but those witnesses while they came to our office never were willing to give an affidavit, and *** the [defendant's] mother, who was in attendance at most of the Court proceedings up until maybe five or six months ago, was aware of that because she came in with the gentleman once and left with him, knowing that he didn't sign the affidavit."

¶ 121    The State agrees that counsel's reference to these "two witnesses," one of whom came into counsel's office with defendant's mother, was not a reference to Andrea Young, Rayetta Felton, or Aisha Daily, but rather to Willie Madlock and most likely Germaine Bledsoe. This second explanation thus has nothing to do with counsel's failure to submit the affidavits of Young, Felton, and Daily, not to mention Grace Warren, during the initial postconviction proceeding.

¶ 122    Thus, in the record, we are left with only one explanation why counsel at the initial postconviction proceeding failed to present the Young, Felton, Daily, and Warren affidavits. It was not because counsel found these witnesses lacking in credibility. It was not because they refused to cooperate. It was because he did not have time to submit them before the limitations period ran on the filing of the petition. We have no explanation for why he did not amend that petition during the four-year period while the petition pended in the trial court. At least two of these affidavits were

prepared back in 2000, at the time the initial postconviction was filed, as the State itself notes. The record further reveals that defendant openly complained—to the point of requesting new counsel—about his lawyer's failure to investigate and support his actual-innocence claim. But the trial court denied that motion without even asking defendant, personally, to elaborate on his handwritten motion or to explain his position in any way. And then, of course, the trial court dismissed the original postconviction petition's actual innocence claim because it lacked the very supporting evidence that defendant was complaining about his lawyer for failing to submit.

¶ 123   Counsel's inexplicable failure to submit the Young, Felton, Daily, and Warren affidavits in support of defendant's actual-innocence claim left the trial court with no choice but to dismiss the initial postconviction petition. See 725 ILCS 5/122-2 (West 2008) (postconviction petition must be supported by "affidavits, records, or other evidence supporting its allegations"); *People v. Delton*, 227 Ill. 2d 247, 255 (2008) (failure to attach affidavits or other evidence is fatal to postconviction petition at first stage).

¶ 124   Postconviction counsel's performance is similar to that in *People v. Johnson*, 154 Ill. 2d 227 (1993). In that case, the defendant filed a *pro se* postconviction petition alleging ineffective assistance of trial counsel in that his trial attorney, among other things, failed to call three identified parole officers at his motion to suppress who could have given materially favorable testimony (*id*. at 242); failed to present testimony of a specific expert in California who would have refuted the State's expert (*id*. at 243-44); and was improperly prepared due to lack of time (*id*. at 244). Postconviction counsel was appointed for second-stage proceedings, but postconviction counsel failed to obtain the affidavits of the parole officers, the expert in California, or trial counsel. *Id*. at 243, 244. The trial court dismissed the petition without an evidentiary hearing. *Id*. at 232.

¶ 125   On appeal from the denial of the postconviction petition, our supreme court reversed the dismissal and remanded for further proceedings, holding that postconviction counsel failed to provide reasonable assistance as required under the Act. *Id*. at 249-50. In language that directly applies to the facts of this case, the court wrote:

"At a minimum, counsel had an obligation to attempt to obtain evidentiary support for claims raised in the post-conviction petition. Because the allegations in the defendant's petition were not supported by affidavits, records, or other evidence, the trial court had no choice but to dismiss the post-conviction petition without an evidentiary hearing." *Id*. at 245.

¶ 126   While *Johnson* arose on appeal from the denial of the initial postconviction petition, the unreasonable assistance by postconviction counsel is quite similar to the allegations before us. In *Johnson*, postconviction counsel had the names of specific witnesses identified in the *pro se* postconviction petition but did not obtain their affidavits. In this case, the four affiants each swore that they met with postconviction counsel about their testimony, but counsel did not support the postconviction petition with their affidavits. In each case, the failure to obtain affidavits guaranteed dismissal of the petitioner's claim. Indeed, in *Johnson*, the State argued that even if the lack of supporting affidavits was *one* basis for dismissal, there were other bases for dismissal, as well, and the court could affirm on those grounds. *Id*. at 245. The supreme court rejected that argument, holding that "[w]hile it is true that the trial court *might* have found grounds, other than the absence of supporting affidavits, to dismiss the defendant's claims, it is not apparent from the record that the trial court *did* dismiss the claims on such grounds." (Emphases in original.) *Id*. Here, in contrast, there is no question that the only reason the trial court dismissed the initial postconviction petition was the lack of supporting affidavits; the court stated that, "with regard to

- 41 -

the newly-discovered evidence claims, *** there are no affidavits in support of those claims ***. Those portions of the post-conviction that refer to newly-discovered evidence will be dismissed." Defendant received no substantive consideration of his actual-innocence claim; the trial court was given nothing to consider.

¶ 127   A glaring difference between this case and *Johnson* is that in *Johnson*, the defendant first filed a *pro se* petition for postconviction relief, specifically detailing the witnesses that should have been called at trial and their purported testimony. *Id*. at 239. It was only after he did so that counsel was appointed for second-stage proceedings. *Id*. The difference, in other words, is that the defendant in *Johnson* had a *record* on which to complain about his postconviction counsel's unreasonable performance on appeal.

¶ 128   Here, in stark contrast, defendant retained a lawyer throughout the initial postconviction proceeding. Having a lawyer, but one who failed to present exculpatory evidence, closed every door to defendant. He could not file his own *pro se* motion with the affidavits. See *People v. Serio*, 357 Ill. App. 3d 806, 815 (2005) ("When a defendant is represented by counsel, he generally has no authority to file *pro se* motions, and the court should not consider them."). He could not meaningfully challenge the reasonableness of his postconviction lawyer's performance on direct appeal, because (quite unlike *Johnson*) he had no record of these four witnesses, much less the substance of their purported testimony. He almost certainly would have run up against the doctrine that, where there is no evidence proving that postconviction counsel has failed to present available evidence to support a petition, courts assume that counsel "made a concerted effort" to obtain such evidence. *Johnson*, 154 Ill. 2d at 241; see also *People v. Waldrop*, 353 Ill. App. 3d 244, 250 (2004). And defendant could not have filed a successive postconviction petition challenging the effectiveness of counsel at the first postconviction hearing, because such a claim does not exist;

there is no constitutional right to counsel at a postconviction hearing. *People v. Flores*, 153 Ill. 2d 264, 280 (1992). Because postconviction proceedings are limited to constitutional claims, a defendant cannot use these proceedings to complain of his counsel's performance at an earlier postconviction proceeding. *Id.*

¶ 129 Defendant could not submit the affidavits on his own; any challenge to his lawyer's performance on appeal from the dismissal of the initial petition would have been fruitless; and he was categorically barred from challenging his postconviction lawyer's effectiveness at a successive postconviction proceeding. About the only recourse available to defendant was to try to fire his lawyer and get a new one—which defendant tried to do, without success.

¶ 130 Under these circumstances, it would be fundamentally unfair to deny defendant an opportunity to present this evidence, to bar it because it is not technically "newly discovered." In any real sense, the evidence of these four witnesses' testimony was *not* available—not to a defendant whose lawyer would not submit the evidence or even create a record of the evidence. The ultimate underpinning of the actual-innocence, or fundamental-miscarriage-of-justice, exception is the due process clause of the Illinois Constitution, and the supreme court's admonition that " 'no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence.' " *Ortiz*, 235 Ill. 2d at 331-32 (quoting *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). It would be a miscarriage of justice if defendant were denied his day in court where his allegations and supporting documentation, supported by the record and taken as true at this stage, demonstrate that he was unable to put forth exculpatory evidence of his innocence through no fault of his own.

¶ 131 We recognize that no Illinois decision has held that evidence may be considered newly discovered by virtue of postconviction counsel's deficient performance. But when a petitioner

seeks leave of court by alleging cause and prejudice, the deficient performance of his postconviction counsel may constitute cause. For example, in *People v. Nicholas*, 2013 IL App (1st) 103202, ¶¶ 43-46, we held that the defendant established cause because his postconviction appellate counsel failed to raise an issue that likely would have resulted in defendant's postconviction petition being remanded for second-stage proceedings. The defendant filed a *pro se* petition asserting that the 2006 report of the Special State's Attorney supported his claim that he had been physically abused into confessing. *Id.* ¶ 24. The trial court dismissed the petition and, on appeal, defendant's postconviction appellate counsel moved to withdraw, claiming that there were no meritorious issues to raise. *Id.* ¶ 25. The appellate court granted postconviction appellate counsel's motion. *Id.* Defendant then filed a successive postconviction petition, again alleging that his confession had been coerced. *Id.* ¶ 27. He argued that he established cause because his postconviction appellate attorney failed to present his claim, despite the fact that the 2006 report expressly implicated the detectives who interrogated defendant as officers who had been involved in the physical abuse of suspects at the Area 2 police station. *Id.* ¶ 43. We agreed that counsel's error showed that defendant's initial postconviction proceedings were fundamentally deficient and that this deficiency established cause. *Id.* ¶¶ 45-46.

¶ 132    We see no reason why a defendant alleging cause and prejudice (like the defendant in *Nicholas*) should be able to rely on his attorney's deficient performance to avoid a procedural default, but a defendant alleging actual innocence (like defendant in this case) should not. In fact, our supreme court held that a petitioner alleging actual innocence is "excused" from establishing cause and prejudice because applying the cause-and-prejudice test "theoretically could bar a petitioner from filing [an] actual innocence claim." *Ortiz*, 235 Ill. 2d at 330, 332. *Ortiz* demonstrates that the procedural hurdles to bringing an actual-innocence claim should be, at the

very least, no *higher* than those for a cause-and-prejudice claim. Because the deficient performance of postconviction counsel may constitute "cause," the deficient performance of postconviction counsel should also excuse the failure to present new evidence in an earlier postconviction petition, at least when facts as unique as these are present.

¶ 133   We also find guidance from federal case law. Our supreme court has often relied on federal decisions in discussing the actual-innocence or fundamental-miscarriage-of-justice doctrine. See, *e.g.*, *Pitsonbarger*, 205 Ill. 2d at 459; *People v. Hudson*, 195 Ill. 2d 117, 124 (2001). Indeed, as the supreme court has noted, Illinois's formulation of the actual-innocence test is consistent with the federal version of that test. See *Edwards*, 2012 IL 111711, ¶¶ 24, 28 (noting that "federal courts employ this same 'colorable claim' formulation in the context of the fundamental-miscarriage-of-justice exception" and citing numerous federal decisions, including *Schlup*, 513 U.S. at 327). And federal case law defines "new" evidence in the same way that Illinois courts define newly discovered evidence. Compare *Houck v. Stickman*, 625 F.3d 88, 93-94 (3d Cir. 2010) and *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997) (defining new evidence as evidence that was not available at trial and could not have been discovered earlier through due diligence), with *Ortiz*, 235 Ill. 2d at 334 (" 'newly discovered' evidence[ ] [is] defined as evidence that has been discovered since the trial and that the defendant could not have discovered sooner through due diligence").

¶ 134   In federal courts, a *habeas* petitioner may use a claim of actual innocence as a means to excuse his or her procedural default of a different, underlying constitutional claim, such as ineffective assistance of counsel. In other words, a *habeas* petitioner may argue that a federal court should hear the merits of his claim because he is innocent and, therefore, declining to consider the merits would be unfair. Such an actual-innocence claim is known as a "gateway" claim. See

*Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("[A] claim of 'actual innocence' is *** a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.").

¶ 135    Federal courts have grappled with the dilemma posed when the actual-innocence test is used as a gateway to an ineffective-assistance-of-counsel claim premised on counsel's failure to present certain evidence at trial. In those cases, the petitioner obviously cannot show that the evidence was "new"—he cannot show that the evidence was unavailable at trial or could not have been discovered, because the very point of his underlying ineffectiveness claim is that it *was* available at trial to his attorney, or his attorney *should* have discovered it. In these situations, federal courts have excused the requirement that the evidence of actual innocence be new, holding that the evidence may be considered "new" where the petitioner's attorney was ineffective in failing to present it. See, *e.g.*, *Gomez v. Jaimet*, 350 F.3d 673, 680 (7th Cir. 2003) (noting that it would "defy reason" to block review of actual-innocence claims on ground that trial counsel was aware of exculpatory evidence previously, when underlying claim of ineffectiveness is premised on trial counsel's very failure to use that known and available exculpatory evidence at trial); *Houck*, 625 F.3d at 94 ("[I]f the evidence was not discovered for use at trial because trial counsel was ineffective, the evidence may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence.").

¶ 136    While these federal cases are not directly on point, they stand for the proposition that the newly-discovered-evidence requirement may work an injustice if applied inflexibly, and that relaxation of this requirement may be necessary where a defendant's presentation of evidence is hindered by his attorney's performance. We think the case before us is just such an instance, where there is no question that defendant and his lawyer were aware of these four witnesses at the time of

the initial postconviction proceeding, but counsel did not submit their affidavits to the court, guaranteeing the petition's dismissal without any consideration on the merits and precluding any meaningful appellate review of counsel's performance on appeal from that dismissal.

¶ 137 We hold that defendant's successive petition and supporting affidavits, taken as true, sufficiently establish that he could not have presented the affidavits in his initial postconviction proceedings due to his attorney's deficient performance, and, consequently, that the affidavits constitute newly discovered evidence.

¶ 138 The dissent claims that we have exceeded our authority in addressing postconviction counsel's performance because defendant did not argue that his postconviction attorney was ineffective. While it is true that defendant did not expressly charge his attorney with providing unreasonable assistance, defendant alleged that his attorney filed the initial petition with a claim of actual innocence that "was not fully developed." He made that argument in the context of explaining why he could not present the affidavits earlier; in other words, why the court should consider them to be newly discovered. Moreover, each of the affidavits stated that the four witnesses had spoken to defendant's postconviction counsel about their potential testimony, but that testimony was not used. As a *pro se* petitioner, defendant was not required to cite legal authority or principles in order to raise a claim on appeal. He simply had to "adequately allege[ ] *facts*" that justify leave to file. (Emphasis added.) *People v. Smith*, 2014 IL 115946, ¶ 34. Defendant's petition, including its supporting affidavits, alleged sufficient facts to question counsel's performance and to justify our consideration of an argument that defendant's evidence should be considered newly discovered because of his attorney's deficient performance.

¶ 139 The dissent cites *People v. Jones*, 213 Ill. 2d 498 (2004), in support of its argument that defendant failed to raise this claim in his petition. But in *Jones*, the defendant filed a petition on a

preprinted form that simply said he was denied effective assistance of counsel, without any elaboration whatsoever. *Id.* at 502. Then, on appeal from the dismissal of his petition, defendant challenged the sufficiency of the trial court's admonitions relating to his guilty plea for the first time. *Id.* The facts of *Jones* are clearly distinct from this case, where defendant alleged facts supporting his claim that he should be permitted to present his affidavits as newly discovered evidence because his attorney unreasonably failed to obtain and present those affidavits during his initial postconviction proceedings. Although defendant's argument may be implied rather than explicit, his allegation of facts sufficient to support his argument is all that the Act requires. See *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 77 (noting that, in *Jones*, the Illinois Supreme Court "did *not* hold that a petition's legal arguments must be explicit or that claims implied by the factual allegations of a petition are forfeited" (emphasis in original)).[5]

¶ 140   We find *People v. Hodges*, 234 Ill. 2d 1 (2009), to be persuasive regarding defendant's alleged forfeiture. There, the defendant's postconviction petition alleged that his trial attorney was ineffective for failing to present the testimony of three witnesses who would have supported a claim of self-defense. *Id.* at 6-7. The Illinois Supreme Court disagreed that the testimony would support a claim of self-defense but held that the testimony would have supported an instruction on

---

[5] The dissent also cites *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32, for the proposition that a *pro se* petitioner must "clearly set for the respects in which [his] constitutional rights were violated." (Internal quotation marks omitted.) We have no quarrel with that proposition. And, in this case, defendant clearly set out how his constitutional rights were violated: he alleged that he was convicted despite the fact that he was actually innocent. Defendant did not—and could not—claim that his postconviction counsel's deficient performance was the constitutional deprivation forming the basis of his postconviction petition. See *People v. Flores*, 153 Ill. 2d 264, 277 (1992) (postconviction petitioner cannot raise ineffectiveness of postconviction counsel as basis for relief because ineffective assistance of postconviction counsel is not constitutional claim). Instead, defendant simply included the facts supporting this claim as part of his explanation for why he should have been granted leave to file a successive petition, *i.e.*, as a reason to excuse his procedural default. Thus, the dissent's quotation of *Mars* does not persuade us that defendant has forfeited this argument.

the lesser offense of second-degree murder. *Id.* at 20-21. The State argued that the defendant had forfeited the second-degree murder argument because the "defendant focused only on the impact the witnesses' testimony would have had on self-defense," but the court rejected that argument, stating, "Where defendants are acting *pro* se, courts should review their petitions 'with a lenient eye, allowing borderline cases to proceed.' " *Id.* at 21 (quoting *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983)). Here, defendant alleged that his initial petition was not properly developed when his postconviction attorney filed it, and the supporting affidavits alleged that postconviction counsel failed to support the initial petition with their testimony even though he was aware of it. While defendant did not articulate the legal theory of unreasonable assistance of postconviction counsel, his *pro se* petition alleged facts supporting such a claim. Just as the court in *Hodges* found that the facts alleged were sufficient to support a legal theory that the defendant did not expressly raise, we conclude that defendant did not forfeit his claim that the affidavits should be considered newly discovered because of his postconviction counsel's deficient performance.

¶ 141   The State and the dissent also argue that our holding will open a floodgate of similar claims, but we do not agree. The facts of this case are unique. First, most postconviction petitioners do not have retained counsel at the first stage, so any complaints about counsel's failure to present evidence or make a record would not apply. If a postconviction petitioner proceeded *pro se* and made some kind of sufficient showing at the first stage, warranting advancement to the second stage and the appointment of counsel, a reviewing court would at least have *some* record on which to gauge the reasonableness of counsel's performance on direct appeal, as the supreme court did in *Johnson*, 154 Ill. 2d at 245. Our holding is confined to the unique instance where retained counsel unreasonably failed to make any record whatsoever of the proffered evidence, thus leaving

defendant in a legal limbo, guaranteeing the dismissal of his petition before the trial court and effectively nullifying any opportunity to complain of his attorney's deficient performance on appeal from that dismissal, while at the same time defendant would be procedurally barred from presenting the evidence in a successive petition because, of course, his counsel knew of the evidence previously but failed to act on it, so it is not newly discovered.

¶ 142 Another unique aspect of this case is counsel's deficient performance. Counsel's on-the-record statements, as well as the supporting affidavits we take as true, show that each of these affiants met with postconviction counsel at the time of the initial postconviction hearing, yet counsel's only stated reason for not submitting their affidavits—that the limitations period was about to run—was wholly insufficient, given that he had four years to amend the petition but inexplicably failed to do so. Taken as a whole, these facts create a persuasive showing that postconviction counsel's performance was unreasonable.

¶ 143 Finally, even if, as the State warns, our holding in this case could be construed to allow far more evidence to be considered newly discovered—which we do not believe—any successive postconviction petitioner bringing an actual-innocence claim would still have to satisfy the remaining elements of such a claim. Here, we have found that these affidavits have sufficient merit to warrant further proceedings. But that will certainly not be the case for every successive petitioner. And where a successive petition has meritorious evidence of a defendant's actual innocence that the defendant could not present earlier through no fault of his own, there is no principled reason why such evidence should not be heard in a successive petition. If that principle of fundamental fairness creates a "floodgate" of cases, which we highly doubt, it is a floodgate we should not only accept but openly welcome.

¶ 144  To summarize, we find that the affidavits recounting the confessions of Madlock and Bledsoe, taken as true, are newly discovered, are material and noncumulative, and are sufficiently conclusive to raise the probability that it is more likely than not that no reasonable juror would convict defendant. Defendant's claim of actual innocence merits further proceedings, and he should be afforded leave of court to file his successive postconviction petition. In light of this conclusion, we do not reach the issue of whether defendant was entitled to leave of court because he established cause and prejudice.

¶ 145  The trial court's order denying defendant leave to file his successive petition is reversed, and this cause is remanded for further postconviction proceedings.

¶ 146                          III. CONCLUSION

¶ 147  For the reasons stated above, we vacate defendant's sentence, remand for resentencing, reverse the trial court's denial of defendant's leave to file a successive postconviction petition, and remand for second-stage postconviction proceedings.

¶ 148  Sentence vacated and remanded; cause reversed and remanded.

¶ 149  JUSTICE GORDON, specially concurring.

¶ 150  I specially concur in this case, but I must write separately for the following reasons.

¶ 151  In the case at bar, the majority concludes both: (1) that the defendant's case must be remanded for resentencing because his natural life without parole sentence violates his eighth amendment right to be free from cruel and unusual punishment; and (2) that this case must be remanded for second-stage proceedings on defendant's actual innocence claim.  I concur with both those conclusions, but I write separately to provide additional support for the second conclusion.

¶ 152                    I. Authority to Address Defendant's Claim

¶ 153   Before addressing the actual innocence claim, we must address a threshold issue, namely, what gives us the authority to address defendant's motion for leave to file a successive petition. *In re Omar M.*, 2014 IL App (1st) 100866-B, ¶ 32 (Gordon, P.J., specially concurring) (after a supervisory order, we are limited to "what we have been asked to do by the supreme court").   The dissent believes that we lack authority to address this point.   However, in addition to the points already addressed by the majority, I also find that the supreme court's supervisory order specifically authorizes to address this issue, as I explain more fully below.

¶ 154   In its latest supervisory order to this court in this case, the supreme court directed us "to vacate" our prior "judgment in *People v. Warren*, case No. 1-09-0884 (12/06/13)" and "to reconsider [our] judgment in light of *People v. Davis*, 2014 IL 115595 *** to determine if a different result is warranted."   *Warren*, No. 117157.

¶ 155   In *Davis*, 2014 IL 115595, the supreme court held: (1) that the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. __, __, 132 S. Ct. 2455, 2469 (2012), which held that a mandatory sentence of natural life without parole for defendants under the age of 18 violates the eighth amendment, applied retroactively (*Davis*, 2014 IL 115595, ¶¶ 40, 42); and (2) that the trial court did not err in denying the defendant leave to file a successive postconviction petition where the defendant failed to show why he failed to raise his ineffective assistance claim earlier (*Davis*, 2014 IL 115595, ¶¶ 52-56).   Thus, the supreme   court's supervisory order gives us authority to reconsider our judgment with respect to both: (1) the sentencing issue; and (2) the issue of whether defendant should have been denied leave to file a successive postconviction petition on the ground that his claim could have been raised earlier. Since we are deciding this case in light of *Davis*, we are conforming to our supreme court's supervisory order.

¶ 156                    II. Actual Innocence Claim

¶ 157   Now having considered the threshold issue of our authority to consider defendant's actual innocence claim, I proceed to consider the claim itself.    However, I analyze this claim in light of certain points overlooked by the majority:   first, that there is no statute of   limitations on an actual innocence claim in Illinois (*People v. Ortiz*, 235 Ill. 2d 319, 331 (2009) (a statutory limitations bar is "incompatible with a defendant's constitutional right" under "the due process clause of the Illinois Constitution *** to assert a freestanding claim of actual innocence based on newly discovered evidence")); second, that we must consider the claim in light of *Davis*, as our supreme court specifically instructed us to do in its supervisory order; and, third, that the rule against hearsay no longer applies to postconviction   proceedings.   Ill. R. Evid. 1101(b)(3) (eff. Jan. 6, 2015) (the Illinois Rules of Evidence "do not apply" to " postconviction hearings").

¶ 158   In the case at bar, defendant appealed the trial court's denial of leave to file a successive petition.   His petition asserted a claim of actual innocence and included several affidavits, which corroborated the testimony of the lone defense event witness who testified at trial that defendant was not in the shooter's vehicle, and which averred that the actual shooter confessed to the crime.

¶ 159   At trial, the State called two witnesses who identified defendant as the shooter in a drive-by shooting. The defense called DeJuan Jones, who testified that he was a passenger in the shooter's vehicle, that defendant was not in the vehicle, and that Willie Madlock was the shooter.    The defense also called defendant's aunt and cousin who provided an alibi for defendant's whereabouts, namely, that defendant was at their house at the time of the shooting.

¶ 160   Defendant's first postconviction petition was filed by counsel, and it alleged that there was newly discovered evidence of actual innocence.   However, his counsel failed to attach any affidavits to the petition, despite the fact that the Post-Conviction Hearing Act requires that "[t]he

petition shall have attached thereto affidavits." 725 ILCS 5/122-2 (West 1998). His counsel stated on the record to the trial court that the witnesses were not willing to sign the affidavits and, thus, the trial court had no choice but to grant the State's motion to dismiss.

¶ 161 Defendant then sought leave to file a successive petition supported by six affidavits. Four of the affidavits were signed and notarized; one was not signed; and one was not notarized. The trial court denied defendant leave to file and the majority affirmed, but the Illinois Supreme Court ordered us to vacate our order and reconsider. We affirmed again and our supreme court again ordered us to reconsider.

¶ 162 On this appeal, defendant claims that his postconviction counsel was ineffective for filing a postconviction petition at a time when none of the affidavits were signed, since there is no statute of limitations for claims of actual innocence. *Ortiz*, 235 Ill. 2d at 331 (a statutory limitations bar is "incompatible with a defendant's constitutional right" under "the due process clause of the Illinois Constitution *** to assert a freestanding claim of actual innocence based on newly discovered evidence"). Like defendant, I can think of no reason why counsel would rush to file a petition without any supporting affidavits when there is no statute of limitations bar.

¶ 163 In *Edwards*, the supreme court stated: "we hold today that leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. The *Edwards* court explained: "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards*, 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (characterizing threshold standard as one of probability)).

¶ 164 On appeal, defendant asks us to consider only the four signed affidavits. In three of the affidavits, the affiants averred that Willie Madlock had confessed to them that he was the shooter. The fourth affiant stated that Jermaine Bledsoe confessed that he was in the shooter's vehicle and that Madlock was the shooter. These affidavits corroborate the testimony of the defense's lone event witness at trial, DeJuan Jones, who testified that he was in the vehicle, that defendant was not in the vehicle, and that Willie Madlock was the shooter. As our supreme court has held countless times, "[t]he admissibility of evidence at trial is a matter within the sound discretion of the trial court and that court's decision will not be overturned [by an appellate court] absent a clear abuse of that discretion." *People v. Adkins*, 239 Ill. 2d 1, 23 (2010). A determination concerning the trustworthiness of the statements is an issue that should be considered first by the trial court. The trial court is in a unique position to receive evidence and to hear and observe witnesses, if needed, on a matter that was never considered below. The trial court is thus in a far superior position than the appellate court to determine, in the first instance, the trustworthiness of these statements. This conclusion is made more compelling when one considers that this case involves a minor facing a possibly very long prison sentence.

¶ 165 *Davis*, which the supreme court asked us to consider, supports this conclusion. *Davis* concerned defendant's *fifth* request for collateral review in which defendant alleged the ineffectiveness of his *original* trial counsel. *Davis*, 2014 IL 115595, ¶¶ 52, 54 (affirming the trial court's denial of leave to file a fifth petition). By contrast in the case at bar, this is only defendant's second postconviction petition and, in it, he alleges the ineffectiveness of his prior postconviction counsel and he alleges it only as a reason to explain the cause of why his affidavits were not presented in that first petition. Unlike *Davis*, this was defendant's first opportunity to raise this issue. Thus, *Davis* supports granting defendant leave to file.

¶ 166　Both the majority and the dissent spill much ink over the fact that the affidavits contain hearsay, but they do this without any recognition that our supreme court specifically amended the Illinois Rules of Evidence so that admissibility is not the standard even at the later third-stage postconviction hearings.　Ill. R. Evid. 1101(b)(3) (eff. Jan. 6, 2015) (the Illinois Rules of Evidence "do not apply" to " postconviction hearings").　This should apply even more strongly at this early stage, where the imprisoned defendant lacks ready access to counsel.

¶ 167　Rule 1101(b)(3) of the Illinois Rules of Evidence was amended on April 8, 2013, to include "postconviction hearings" on the list of proceedings to which the rules of evidence do not apply. Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013). Thus, case law issued prior to this date, which does not take this change into account, may not be applicable.　Although the trial court's decision was issued before the amendment, our review is *de novo* and, thus, this amendment governs our consideration.

¶ 168　Lastly, I would like to point out that the "probability" required at this early stage (*Edwards*, 2012 IL 111711, ¶ 24)[6]  is less than the "substantial showing" required at the later second stage (*Smith*, 2014 IL 1154946, ¶ 29).　Both the second stage and a motion for leave to file a successive petition require a review of "the petition and any accompanying documentation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001) (second stage review); *Edwards*, 2012 IL 111711, ¶ 24 (motion for leave to file a successive petition).　For the second stage to not be superfluous for a successive petition, it must be that the "substantial showing" required at the second stage is greater than the "probability" required for leave to file a successive petition.　*Smith*, 2014 IL

---

[6] " [L]eave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.' " *Edwards*, 2012 Il 111711,　 ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)); *supra* ¶ 78.

115946, ¶ 29 (expressing a desire not to "render the entire three-stage postconviction process superfluous").

¶ 169   For these reasons, I specially concur but I write separately to provide additional support for our holding.   I concur in the decision both (1) to reverse and remand for second-stage proceedings on defendant's actual innocence claim and (2) to vacate defendant's sentence and remand for resentencing.

¶ 170   PRESIDING JUSTICE McBRIDE, concurring in part and dissenting in part.

¶ 171   I agree with the majority's decision to remand for a new sentencing hearing pursuant to *People v. Davis*, 2014 IL 115595.   However, I dissent from the decision to remand for a second-stage hearing of defendant's successive post conviction petition for the reasons that follow.

¶ 172   In our original judgment in this case, we denied defendant's request to remand for a new sentencing hearing, concluding that, because that sentencing issue was being raised for the first time on appeal, we lacked the supervisory authority to consider the claim. *People v. Warren*, 2013 IL App (2d) 090884-U.   However, since that judgment was issued, the Illinois supreme court in *Davis* considered the retroactivity of *Miller v. Alabama*, in which the Supreme Court of the United States held that a mandatory sentence of life without the possibility of parole for a defendant convicted of murder committed when that defendant was a minor violated the eighth amendment's prohibition against cruel and unusual punishment. *People v. Davis*, 2014 IL 115595, ¶ 10 (citing *Miller v. Alabama*, 567 U.S. __, 132 S.Ct 2455 (2012)). Our supreme court held in *Davis* that the *Miller* holding was a new substantive constitutional rule that applied retroactively on postconviction review. *Id.* at ¶ 34.

¶ 173   On remand and following the direction of the supreme court to reconsider that judgment in light of *People v. Davis*, we have now concluded that defendant is entitled to a new sentencing

hearing because he was 17 years of age at the time that he committed the murder of which he was thereafter convicted. The supervisory order entered by the Illinois Supreme Court directed us to vacate our judgment only, not our decision, and reconsider that judgment. *People v. Warren*, No. 117157 (Ill. Jan. 28, 2015). Since we have reconsidered our judgment in light of *Davis*, and have concluded a different judgment is warranted, there is no other action to take or any other authority that we have. I would remand for a new sentencing hearing and otherwise affirm the trial court's decision denying leave to file the successive petition on the actual innocence claim in conformity with our earlier decision.

¶ 174 The State's position on remand is that because the supreme court directed us to vacate our judgment and reconsider that judgment in light of *Davis*, we may only address the sentencing issue. Defendant responds that the supreme court's denial of leave to appeal is not a decision on the merits of this case and that the denial carries no approval or disapproval of our appellate court action. While this general statement may be accurate, for reasons explained below, I agree with the State's argument. The mandate in this case was limited and specific, and based upon established precedent we have no authority to go beyond the mandate. Therefore, the only issue upon remand is whether our previous judgment denying defendant the right to a new sentencing hearing was correct in light of *Davis*. Because defendant was 17 years of age at the time of the commission of this murder, he is entitled to a new sentencing hearing. However, in my opinion, remanding for a new sentencing hearing is the only authority this court has.

¶ 175 The case law on a court's power on remand from a court of review is well-settled. Where a matter is remanded by a court of review to a lower court with directions to enter a certain order or decree, the latter court has no discretion but to enter the decree as directed. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2012 IL App (2d) 100024, ¶ 32. Where the directives of a reviewing

court are specific, a positive duty devolves upon the court to which the cause is remanded to enter an order or decree in accordance with the directions contained in the mandate. The lower court has no authority to go beyond the dictates of that mandate. *Fidelity & Casualty Co. of New York v. Mobay Chemical Corp.*, 252 Ill. App. 3d 992, 997 (1992). Precise and unambiguous directions in a mandate must be obeyed. *Bond Drug Co. of Illinois v. Amoco Oil Co.*, 323 Ill. App. 3d 190, 196 (2001). Because a lower court is required to follow the mandate and has no authority to go beyond the dictates of the mandate, the duty of the lower court to follow the mandate of the reviewing court may be enforced by the extraordinary measure of a *mandamus* action. *People ex rel. Campo v. Matchett*, 394 Ill. 464, 469 (1946).

¶ 176 Here the matter was remanded to this court to vacate our judgment and reconsider that judgment in light of the supreme court's decision in *Davis*. The mandate was specific, clear and directed us to reconsider in light of the *Davis* holding. It is the duty of this appellate court to follow the specific directions of the supreme court, and not to go beyond them.

¶ 177 In concluding that there was no specific mandate here, the majority cites two cases—*Kelch v. Watson*, 237 Ill. App. 3d 875 (1992) and *Flavell v. Ripley*, 247 Ill. App. 3d 842 (1993). However, neither one of these cases supports its conclusion, because they did not involve a remand order from our supreme court after the denial of a petition for leave to appeal.

¶ 178 In *People ex rel. Birkett v. Bakalis*, 196 Ill. 2d 510 (2001), the supreme court explained the nature of supervisory orders like this one. There, the supreme court considered the State's request for either a *mandamus* or supervisory order to compel a circuit judge to vacate that judge's order permitting the deposition of a witness in a capital case pursuant to what was, at that time, a new supreme court rule. The *mandamus* request was denied, but the supreme court allowed briefing on

the State's alternative request for a supervisory order. Before denying the supervisory relief, the court pointed out that:

"Supervisory orders are granted by our court only in limited circumstances. Their predominate use is to address issues which are brought to our attention in the context of petitions for leave to appeal, but which do not warrant full briefing, oral argument and issuance of an opinion. The most typical example of this is when a new opinion is released by this court or by the Supreme Court of the United States which appears to be dispositive of other cases pending before us on petitions for leave to appeal. Because issuance of additional opinions addressing the same legal question in each of the pending cases would contribute little to this state's body of legal precedent, our normal practice is to exercise our supervisory authority to vacate the lower court's judgment and remand for reconsideration in light of the new decision." *Birkett*, 196 Ill. 2d at 512-13.

¶ 179   The remand order directing us to reconsider our judgment in light of *People v. Davis* is an example of the supreme court's use of a supervisory order, since the supreme court's holding in *Davis* is dispositive of the sentencing issue in this case. Thus, *Davis* instructs this court that defendant is entitled to a new sentencing hearing, and that is the mandate we have to follow.

¶ 180   Further support for interpreting the mandate as I do is contained in the Style Manual for the Supreme and Appellate Courts of Illinois. That manual states that when the supreme court issues a

remandment order to the appellate court by way of a supervisory order disposing of a petition for leave to appeal,

"[i]t is generally only the judgment that is to be withdrawn and reconsidered, not the opinion that delivered that judgment.

\*\*\*

The entry of such a remandment order by the Supreme Court after consideration of a petition for leave to appeal has the same effect as if the Supreme Court had allowed the appeal and remanded the cause to the appellate court in an opinion. In either case, only the judgment of the appellate court is to be vacated and reconsidered; in the absence of specific directions to do otherwise, the appellate court must not withdraw the opinion or order it previously filed.

\*\*\*

The remanded cause will proceed under the previously assigned docket number in the appellate court. When the appellate court files its new opinion or order, that opinion is not a modified or revised one but simply a new opinion   and is given a new filing date \*\*\*. It is permissible, and based upon the context often desired, for the new opinion to reference the previously filed opinion and rely upon holdings therein to the extent doing so does not conflict with the supreme court remandment order." Style Manual for the Supreme and Appellate Courts of Illinois § I(G)(2), (3), at 16-17 (4th ed. rev. 2012).

¶ 181 I would add that we could depart from our previous decision, if that is what the mandate directed us to do. However, my reading of the mandate is obviously contrary to that of the majority. Additionally, I disagree with any suggestion that the mandate's directive depends on whether a new panel member is sitting in the place of another appellate judge who is no longer on the court. The mandate is limited to whatever the supreme court directs us to do, and we must follow that direction. The previous mandate directed this very same court to reconsider the dismissal of this successive petition in light of *Edwards*, which we did on a previous occasion in the earlier appeal. *People v. Warren*, 2013 IL App (1st) 090884-U. Had the supreme court intended for this court to revisit that issue again, because we had not properly done so, it could have directed us to revisit *Edwards* along with *Davis*.

¶ 182 Based on the foregoing, I would remand this case for a new sentencing hearing in light of *Davis*, and end the inquiry there. Because I believe that the majority has improperly gone beyond the supreme court's mandate, I dissent from the decision to remand for further proceedings.

¶ 183 Moreover, even if I am mistaken in my interpretation of the supreme court mandate, and we have the authority to go beyond the sentencing issue outlined in *Davis*, I would still affirm the decision of the trial court.

¶ 184 In concluding that defendant's successive postconviction petition should go forward, the majority reviews a forfeited issue in this case, based on defendant's postconviction counsel's allegedly "deficient performance." *Supra* ¶ 131. However, we are precluded from reviewing such an issue because defendant, himself, never claimed in his successive petition that post conviction counsel was unreasonable or ineffective for failing to file the affidavits which are attached to his successive petition. *People v. Jones*, 213 Ill. 2d 498, 505-07 (2004). That claim was raised for the

first time by appellate counsel in supplemental briefs after the remand order directing this court to reconsider in light of the *Edwards* decision. *People v. Warren*, 2011 IL App (1st) 090884-U.

¶ 185   An attempt to raise a new issue on appeal from the denial of the successive petition is not permitted (see *Jones*, 213 Ill. 2d at 505-06; *People v. Coleman*, 2011 IL App (1st) 091005, ¶ 16), and an appellate attorney has no right to raise any issue on appeal that is not contained in defendant's postconviction petition (*Coleman*, 2011 IL App (1st) 091005, ¶ 18). More importantly, this court lacks the authority to excuse an appellate forfeiture caused by the failure of a litigant to include issues in his post conviction petition. See *Jones*, 213 Ill. 2d at 506-08 (criticizing this court for inappropriately overlooking the waiver provision of the Act). By addressing defendant's new claim on appeal that his postconviction counsel performed deficiently by failing to file certain affidavits, this court is going beyond the bounds of its authority. See *Jones*, 213 Ill. 2d at 507 ("As we have repeatedly stressed, the appellate court does not possess the supervisory powers enjoyed by this court *** and cannot, therefore, reach postconviction claims not raised in the initial petition ***.").

¶ 186   The majority contends that "defendant alleged that his initial petition was not properly developed when his postconviction attorney filed it, and the supporting affidavits alleged that postconviction counsel failed to support the initial petition with their testimony even though he was aware of it." *Supra* ¶ 140. The majority further states that defendant "alleged facts supporting his claim that he should be permitted to present his affidavits as newly discovered evidence because his attorney unreasonably failed to obtain and present those affidavits during his initial postconviction proceedings." *Supra* ¶ 139. I find no such allegations in defendant's petition. The only line in the entirety of defendant's 34-page petition that the majority appears to be relying on, actually appears in defendant's motion for leave to file his successive petition, in which he states

that "at the time the initial post-conviction petition was filed and amended, his claim of newly discovered evidence as to the second murder was not fully developed." Defendant never explicitly or implicitly blames postconviction counsel for this failure, and in fact, never mentions postconviction counsel in any way shape or form. To the contrary, defendant contends that the affidavits were recently discovered, having only been "given in late 2006, 2007 and 2008," negating any claim that postconviction counsel could have or should have used them in his 1999 petition.

¶ 187   An extensive review of the petition discloses no suggestion that postconviction counsel provided unreasonable assistance. Instead, defendant alleges that he is actually innocent based on the attached affidavits, and that *trial* counsel was ineffective for, among other things, failing to file pretrial motions, failing to interview and call all available witnesses who could have testified to his alibi, and failing to investigate the "lead" that defendant was not present and that the real perpetrators were Willie, Jermaine, Clay, and Dejuan. Defendant finally contends that his *appellate* counsel was ineffective for failing to challenge trial counsel's effectiveness. If defendant felt that it was postconviction counsel who had derailed his actual innocence claim, he could have easily set forth such a claim in his successive petition, particularly where, as the majority points out, he filed a motion to have that attorney withdraw. Instead, defendant indicated the numerous ways that he believed trial and appellate counsel provided ineffective assistance of counsel, never mentioning postconviction counsel at all.

¶ 188   As a result, even a liberal review of the petition does not, in any way, suggest that defendant made any claim regarding postconviction counsel in his successive petition. As the court in *People v. Mars* observed, "However low the threshold, the petition must 'clearly set forth' the respects in which the petitioner's constitutional rights were violated. [Citation.] This means that

the pleading must bear some relationship to the issue raised on appeal. Liberal construction does not mean that we distort reality." (Internal quotation marks omitted) 2012 IL App (2d) 110695, ¶ 32 (holding that where the defendant's *pro se* petition alleged that "defense counsel" was ineffective for not challenging the indictment on the basis that it lacked essential elements of the crimes charged, the appellate court could not conclude that the defendant actually raised a claim relating to appellate counsel's failure on direct appeal to raise the issue of compulsory joinder and violation of his right to a speedy trial).

¶ 189   Moreover, even assuming we could somehow justify the overreach of our authority in the foregoing two ways, I would conclude that the successive petition filed here does not set forth or satisfy the test for claims of actual innocence outlined by our supreme court in *People v. Edwards*, 2012 IL 111711. The supreme in court *Edwards* held that in order to warrant second-stage proceedings, a petitioner must show that the petition and documentation provided, has set forth a colorable claim of actual innocence. *Id*. ¶ 24. To establish such a claim, the evidence supporting defendant's claim must be: (1) newly discovered, (2) material and not merely cumulative, and (3) of such a conclusive character that it would probably change the result on retrial.   *Id*. ¶ 32.

¶ 190   The majority appears to recognize that the first element—that the evidence must be newly discovered—is lacking in this case. *Supra* ¶¶ 114, 130; *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21 ("if the evidence was available at a prior posttrial proceeding, the evidence is *** not newly discovered"). The majority attempts to justify its absence by asserting that defendant was precluded from raising his actual innocence claim because his attorney provided an unreasonable level of assistance in failing to attach the exhibits which are now attached to defendant's successive petition. The majority acknowledges that claims that an attorney provided an unreasonable level of assistance during postconviction proceedings do not state a claim of a constitutional violation

(*supra* ¶ 128; *People v. Flores*, 153 Ill. 2d 264, 280 (1992)), but contends that what would otherwise not be newly discovered evidence can become "newly discovered by virtue of postconviction counsel's deficient performance." *Supra* ¶ 131.

¶ 191   As an initial matter, I disagree with any suggestion that defendant's postconviction counsel provided an unreasonable level of assistance to defendant when he filed the first postconviction petition in 1999. Postconviction counsel provided defendant with not only the reasonable level of assistance to which he was entitled, but that attorney was effective in his representation.

¶ 192   I believe that the majority's view on this point is, in part, based on a misreading of the record, leading to the mistaken belief that the affidavits attached to the successive petition were the affidavits counsel previously indicated that he had intended to file. This conclusion is not supported by the record, which shows that defendant's counsel never intended to file the affidavits that are attached to defendant's successive postconviction petition. Instead, the affidavits that counsel wished to file, and that ultimately remained elusive, were those of Willie Madlock and Germaine Bledsoe.

¶ 193   In standing on the actual innocence claim without offering any affidavits, postconviction counsel, Mr. Peters, informed the court that he had no affidavits that he could file to support the claim. He stated that he had been in touch with three witnesses who he believed would give statements, but ultimately, they did not come forward to swear to an affidavit. The court continued the case for ruling, and, on the next court date, before ruling, the court noted that it had received a substitution of counsel motion from defendant. Mr. Peters was questioned about the motion, and he explained:

> "I think that what he's alluding to is something that came up the last
> time we were in front of your Honor, which is that there is a witness,

two witnesses who for a long period of time, and I mean years, had told family members and friends that they were willing to come in and provide an affidavit with respect to one of the two claims, but those witnesses while they came to our office never were willing to give an affidavit, and his mom, the petitioner's mother, who was in attendance at most of the Court proceedings up until maybe five or six months ago, was aware of that because she came in with a gentleman once and left with him, knowing that he didn't sign the affidavit."

¶ 194    Based on my reading of the record, it is clear that the affidavits Mr. Peters was attempting to secure were the eyewitness accounts of Willie Madlock and Germaine Bledsoe, admitting to their presence and participation in the offense. This conclusion is also consistent with the affidavits defendant attached to his successive petition, in which certain affiants contend that Willie and Germaine went to defendant's counsel's office, but refused to confess or sign affidavits once there. Thus, the affidavits that would have supported defendant's actual innocence claim, with eyewitness accounts based upon personal knowledge of the affiants, never materialized. Here, the record shows that counsel made a concerted effort to secure the affidavits of Willie and Germaine, but he was unable to do so. That failure does not make his performance unreasonable. *People v. Johnson*, 154 Ill. 2d 227, 241 (1993).

¶ 195    The majority, however, states that counsel was "likely" referring to Andrea Young, Rayetta Felton, and Aisha Daily when he stated that he had not been able to get the affidavits of three witnesses prior to the expiration of the statue of limitations. *Supra* ¶ 119. However, the affidavits of these witnesses, which are now supporting the successive petition, are clearly not the affidavits

Mr. Peters was either referring to or hoping to file with the first petition. As the majority points out, the affidavits of Felton and Young appear to have been originally prepared back in 2000, during their initial meeting with postconviction counsel. To suggest that defense counsel failed to secure signatures from these willing witnesses, as the majority concludes, distorts the successive petition actually filed, and the record of those proceedings.

¶ 196    Instead, the record is clear that counsel chose not to submit those affidavits in support of defendant's petition, because doing so would have been wholly meritless. In the affidavits of Andrea Young, Rayetta Felton, and Aisha Daily, the affiants generally aver that they spoke to Willie Madlock or Germaine Bledsoe, who told them that Willie was the real perpetrator of the offense. These affidavits are entirely based on hearsay, and do not support a postconviction claim. Counsel rightly recognized that such affidavits would not support defendant's claim, and stood on the actual innocence claim in the petition, although it lacked evidentiary support.

¶ 197    The hearsay nature of these affidavits demonstrates two things: first, that the petition could not survive summary dismissal, and, second, that the performance of postconviction counsel in choosing not to submit these affidavits was reasonable and effective.

¶ 198    Whether a postconviction claim can survive the first stage of the proceedings depends upon whether defendant's petition conforms to the requirements of the Post-Conviction Hearing Act. *People v. Collins*, 202 Ill. 2d 59, 66-67 (2002); *People v. Delton*, 227 Ill. 2d 247, 256 (2008). The Act requires a petitioner to provide affidavits, records, or other evidence to show that petitioner's allegations are capable of objective or independent corroboration. *Delton*, 227 Ill. 2d at 254; *Collins*, 202 Ill. 2d at 66-67. An affidavit is a declaration on oath, in writing, and sworn to before some person who has authority under the law to administer oaths. *People v. Brown*, 2014 IL App (1st) 122549, ¶ 56 (citing *People v. Gray*, 2011 IL App (1st) 091689, ¶ 13).

"An affidavit 'should consist of factual propositions to which the affiant could testify in an evidentiary hearing' [citation]. Moreover, the 'affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petitioner's allegations.' [Citation.] If the content of the affidavit is no more than hearsay, then it is insufficient to support a claim under the Act."

*Brown,* 2014 IL App (1st) 122549, ¶ 56.

¶ 199 Affidavits must be based upon personal knowledge upon which a witness could competently testify. Hearsay evidence is not competent evidence and cannot support a postconviction claim. *People v. Morales*, 339 Ill. App. 3d 554, 565 (2003) (where the defendant submitted affidavits in which the affiants claimed to have had conversations with "Robert Moncada," who confessed that he, and not the defendant, was the second gunman in the offense, and with one of the victims of the offense, who allegedly recanted his trial testimony identifying the defendant, the affidavits contained inadmissible hearsay and did not support the defendant's claim of actual innocence); *Brown*, 2014 IL App (1st) 122549, ¶¶ 56-58 (where the statements supporting the defendant's postconviction claim of ineffective assistance of counsel were comprised of hearsay from the defendant that the Assistant State's Attorney had informed her lawyer of a 20-year plea offer and that her trial counsel informed her mother and brother of a 20-year plea offer, they were insufficient to support a claim under the Act, and the defendant's petition was properly dismissed at the first stage of proceedings); *People v. Gray*, 2011 IL App (1st) 091689, ¶ 13 (hearsay statement of a declarant claiming to have spoken to an eyewitness who identified the defendant as the perpetrator at the trial, and who allegedly recanted that testimony to

the declarant and claimed to have informed the defendant's trial counsel that the defendant was not the shooter, was insufficient to support the defendant's successive postconviction petition alleging ineffective assistance of trial counsel).

¶ 200 The affidavits presented here are not capable of any objective or independent corroboration. They are not based upon the personal knowledge of the affiants; they are comprised, almost entirely, of hearsay. Since there is no admissible evidence contained in the affidavits, the petition is fatally deficient and was properly dismissed. Consequently, the postconviction attorney cannot be faulted for not filing these affidavits with the original postconviction petition. A competent attorney is not required to, and indeed would not, file affidavits that could not support a postconviction petition. See *People v. Greer*, 212 Ill. 2d 192, 205 (2004); *McCoy v. Court of Appeals,* 486 U.S. 429, 436 (1988) ("Neither paid nor appointed counsel may deliberately mislead the court with respect to either the facts or the law, or consume the time and the energies of the court or the opposing party by advancing frivolous arguments."). An attorney does not perform either unreasonably or deficiently when the affidavits that were not filed did not, nor could not support the actual innocence claim in any event. *Greer*, 212 Ill. 2d at 205. In light of the above, we cannot say that postconviction counsel provided unreasonable assistance for deciding not to submit hearsay affidavits in support of a nonmeritorious claim of actual innocence. *Greer*, 212 Ill. 2d at 205; *People v. Johnson,* 17 Ill. App. 3d 277, 279 (1974).

¶ 201 The hearsay flaw inherent in the affidavits is acknowledged by the majority, but is excused for reasons, which, in my opinion, are not supported by any relevant case law. The majority concedes that the affidavits are "problematic" because they contain hearsay, but suggests that the hearsay fits into the exception enunciated by Justice Powell in the venerable *Chambers v. Mississippi* decision. 410 U.S. 284 (1973). *Supra* ¶¶ 88, 95. The affidavits here do not, in any way,

meet what that Court and many others courts have described as a narrow exception to the general rule against the introduction of an unsworn, out-of-court declaration that the declarant committed the crime and not the defendant on trial, even though the declaration is against the declarant's penal interest. See *Tenney*, 205 Ill. 2d at 435.

¶ 202    The facts set out in the *Chambers* decision demonstrate the need for, and specific type of evidence that fits, this very narrow exception against the traditional rule excluding hearsay evidence at trial.   In *Chambers*, the defendant was accused of murdering a police officer in 1969. Shortly after the crime occurred, a different person (McDonald) confessed to several friends that he had killed the officer, and he later made a sworn confession to the crime. There was also corroborating evidence that one eyewitness had seen McDonald shoot the victim, and another eyewitness saw McDonald holding a gun immediately after the shooting, and that McDonald owned the type of gun that was used in the shooting. At defendant's trial, the defendant called McDonald as a witness, but McDonald repudiated his confession on the stand. Due to Mississippi's " 'voucher' rule," which barred parties from impeaching their own witnesses, the defendant was denied permission to examine him as an adverse witness. *Chambers,* 410 U.S. at 294-95. Moreover, Mississippi law did not recognize an exception to the hearsay rule for statements made against penal interests, thus preventing the defendant from introducing evidence that McDonald made self-incriminating statements to three other people. *Id.* at 297-99.

¶ 203    Observing that Mr. Chambers' defense was "far less persuasive" than it might have been had he been allowed to present testimony from other sources about the confession, the United States Supreme Court ruled that the hearsay statements came with "considerable assurance of their reliability" because (1) the confession was made spontaneously to a close acquaintance shortly after the crime occurred, (2) it was corroborated through other evidence, (3) the declarant's

statements were against his penal interests, and (4) the declarant was available in court for cross-examination. *Chambers,* 410 U.S. at 300-01. Given these circumstances, the Supreme Court concluded that the defendant had been deprived of his constitutional right to a fair trial. *Id.* at 302.

¶ 204   The purpose of the rule established in *Chambers* is to allow evidence of what would otherwise be hearsay statements implicating the declarant and exculpating the defendant, but only when the court has "considerable assurance of the[] reliability" of those out-of-court statements. *Id.* at 300; see also *Lee v. McCaughtry*, 933 F.2d 536, 537 (7th Cir. 1991) ("*Chambers \*\*\** holds that states may not use the hearsay rule to deprive defendants in criminal cases of *reliable and important evidence*." (Emphasis added.)); *People v. Edwards*, 2012 IL 111711, ¶ 32 (observing that claims of actual innocence must be supported " 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " (quoting *Schlup*, 513 U.S. at 324)).

¶ 205   This case, however, has none of the hallmarks of reliability that were present in *Chambers*. While arguably some of the alleged statements were against a penal interest—as they will be in all cases in which a defendant attempts to introduce evidence pursuant to this hearsay exception (see *People v. Tenney*, 205 Ill. 2d 411, 436 (2002) (" 'As a statement of such a nature is the bedrock for the exception, that factor, obviously, must be present.' " (quoting *People v. Keene*, 169 Ill. 2d 1, 29 (1995))))—the statements here were made under circumstances that are so unreliable that they have no evidentiary value. Specifically the two requirements which are the most difficult to fabricate—namely, that the statements were made spontaneously to a close acquaintance shortly after the crime occurred, and that the declarant was available for cross-examination—are wholly absent in this case. Finally, while it could be argued that the alleged statements were "corroborated" by the defense presented at trial—namely, Dejuan Jones's testimony regarding

Willie Madlock as the shooter and the alibi testimony—this kind of corroboration, in the form of other testimony from defendant's friends and family, is not the kind of corroboration that gives "considerable assurance of the[] reliability" of the out-of-court statements.

¶ 206   None of the out-of-court statements were made spontaneously to a close acquaintance of the declarant shortly after the crime occurred. Instead, these statements were all made under circumstances that can be described as, at best, questionable—they were made several years after the shooting, to individuals who were essentially unknown to the declarant (and who happen to be friends and family members of defendant). There was also absolutely no opportunity for cross-examination of the declarant, and there will likely never be that opportunity, because according to some of the affiants, Germaine Bledsoe and Willie Madlock are either dead or living in another state. These two factors, which are lacking here, are the factors that would most support the reliability of the statements so as to justify their admission, and prevent the rule from being abused.

¶ 207   The absence of these factors should be dispositive here, because there is no other way to prevent the absolute corruption of the exception to the rule which would occur if friends and family members of a petitioner could testify with impunity about alleged declarations made by "the real offender" years after the fact. The floodgates would open if traditional rules of evidence, which have been in place for years, suddenly have no meaning in postconviction proceedings.

¶ 208   The supreme court's decision in *People v. Tenney* provides another example of when the narrow exception to the general rule prohibiting the introduction of an unsworn, out-of-court declaration that the declarant committed the crime and not the defendant on trial may be utilized. An examination of the facts of *Tenney*, as compared to this case, clearly show how such an exception could never be applicable in this case.

¶ 209    In *Tenney*, the record showed that a different individual, Lionel Lane, had previously been charged, tried and convicted of the same murder for which the defendant was on trial. Lane's conviction however, had been vacated on the State's motion after defendant was later charged with the murder. Defendant attempted to present the theory at trial that the real offenders were Lane and three other individuals. At trial, the court allowed some evidence that Lane committed the murder, but excluded evidence regarding a conversation Lane had with his ex-girlfriend, Lorie Mohle, in which Lane made inculpatory remarks that exculpated the defendant. Specifically, the court excluded statements in which Lane told Mohle that he and three others  went to the victim's house, and were " 'ransacking the house trying to look for jewelry, money, something they could sell,' " before one of the co-offenders shot the victim. *Tenney*, 205 Ill. 2d at 432. Both Lane and Mohle were unavailable for defendant's trial, but Mohle had previously testified under oath for the State at Lane's trial.

¶ 210    The supreme court initially explained that, generally, an unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is not admissible, even though the declaration is against the declarant's penal interest. *Tenney*, 205 Ill. 2d at 433. The court continued:

> " 'The practicality of this rule is obvious. General admission of such statements could seriously handicap the administration of justice in tempting everyone accused of crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime. The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure. But it

would be absurd, and shocking to all sense of justice, to indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane or outside the jurisdiction of the court.' " *Id.* at 433-34 (citing *People v. Lettrich*, 413 Ill. 172, 178 (1952)).

¶ 211 The court then went on to consider whether justice required the admission of the out-of-court statements at issue, using the *Chambers* factors. As to the first factor, the court observed that, although the statement was made nine months after the murder and thus was not shortly after the crime occurred, the statement was made spontaneously and to a close acquaintance. The court found that the relationship between Lane and Mohle, and the circumstances surrounding the declaration, were "factors of reliability." The court found the second factor satisfied, given the substantial evidence in the record corroborating the statement—indeed, Lane had been previously convicted of that offense—including that the victim's house had been broken into and that personal property had been taken. The third factor was also satisfied because Lane's statement was self-incriminating and against his penal interest. Finally, the court found that the fourth factor was not satisfied, because Lane was not available for cross-examination.

¶ 212 In concluding that the hearsay statement was made under "circumstances that provide considerable assurance of its reliability," the court also found "an additional *indicium* of reliability" beyond the *Chambers* factors. *Id.* at 439, 441. Specifically, the court noted that the State previously prosecuted Lane for this crime and obtained his conviction, and that Mohle's testimony—including the hearsay statement—had been introduced at his trial. The court thus

agreed with defendant, that it was "anomalous for the State to now oppose admission of Lane's hearsay statement for defendant because the State used the same evidence to convict Lane." *Tenney*, 205 Ill. 2d at 440. Given the "unique and rare circumstances surrounding" the *Tenney* case, the court concluded that the court abused its discretion in excluding the evidence of Lane's out-of-court statement. *Id*. at 439.

¶ 213 This case, however, does not possess the same "unique and rare circumstances" that were present in *Tenney*. While Lane spontaneously confessed to a close acquaintance, in circumstances which supported the reliability of the statement, here the purported declarants allegedly confessed, years after the offense, to friends and family of defendant, who in many cases, did not even know the declarant's last name. There is also not the same kind of corroborating evidence present in this case as in *Tenney*, where here, the only "corroboration" came from the trial testimony of other friends and family members, who, as will be discussed below, provided contradictory testimony and suffered major credibility issues. Moreover, Willie Madlock and Germaine Bledsoe have not previously been charged with, or convicted of, the offense, as was Lane in *Tenney*, in a case in which the proffered out-of-court statements was previously admitted.

¶ 214 The majority also supports the use of these otherwise unacceptable hearsay affidavits by citing the well-known principle that we must "take as true all well-pleaded facts in defendant's successive petition." *Supra* ¶ 77. Although it is true that we accept all well-pleaded facts as true, and that credibility determinations are inappropriate at the first stage of an original or successive petition, the affidavits here do not contain well-pleaded facts, as they are not based upon personal knowledge of the affiants and they contain no competent evidence which could support an actual innocence claim.

¶ 215   The next element required to establish an actual innocence claim is that the evidence supporting defendant's claim must be material and not merely cumulative. It could certainly be argued in this case that the affidavits attached to defendant's successive petition are merely cumulative to the evidence that was presented at trial. Defendant's theory at trial was that he was not present for the offense and that Willie Madlock was the real perpetrator. In support of that theory, the defense called Dejuan Jones, who testified that he was in the vehicle with Willie Madlock when he started shooting at a group of people. If anything, at least Dejuan's testimony at trial was based on his purported personal knowledge as an alleged passenger in the vehicle during the offense, as opposed to the affidavits submitted here, which also propose the theory that Willie was the real shooter of the victim, but do so only through hearsay in the form of purported statements of Willie Madlock and Germaine Bledsoe. The trial court, however, rejected Jones's testimony and the defense's theory at trial, and found defendant guilty. I would thus find that the affidavits submitted here are cumulative to the evidence that was already presented, and rejected, at trial.

¶ 216   More importantly though, I would find that that defendant did not set forth a colorable claim of actual innocence, because the evidence supporting his claim is not of such a conclusive character that it would probably change the result on retrial.   Given the strong evidence that was presented at trial, even if all the statements in the affidavits were considered together and accepted as true, they would not raise the probability that no reasonable juror would have convicted defendant.

¶ 217   The "no reasonable juror" standard that Illinois courts use in determining whether the petitioner has met the third prong of showing a colorable claim of actual innocence, is also utilized by the federal courts in certain *habeas corpus* proceedings. The United States Supreme Court has

stated that this standard requires the petitioner to show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Supreme Court Justice O'Connor specifically rephrased this standard, by stating that a petitioner fails to meet the requirements when a court believes that "it more likely than not that there is *any juror* who, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt." (Emphasis added.) *Id.* at 333 (O'Connor, J., concurring). This standard has been recognized to be stronger than the showing necessary to establish prejudice under *Strickland*. See *Morales v. Johnson*, 659 F.3d 588, 605 (7th Cir. 2011). The Supreme Court has also observed that the standard is intended to "ensure[] that petitioner's case is truly 'extraordinary,' [citation] while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In making this determination, we, as a reviewing court, "consider all the evidence, old and new, and based on this total record, make a 'probabilistic determination about what reasonable, properly instructed jurors would do.' " *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)).

¶ 218   The affidavits supplied here, for several reasons discussed below, do not raise the probability that no reasonable juror would have convicted defendant in light of the new evidence. *Sanders*, 2016 IL 118123, ¶ 40. In affirming the dismissal of a successive petition at the second stage, the supreme court recently observed in *Sanders* that "the conclusiveness of the new evidence is the most important element of an actual evidence claim." *Sanders*, 2016 IL 118123, ¶ 47 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). The court explained:

> "We need not address whether petitioner's new evidence could have
>
> been discovered earlier in the exercise of due diligence and whether

it is material and not merely cumulative because we conclude that, even assuming these conditions have been satisfied, the evidence is not of such conclusive character that it would probably change the result on retrial. We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 219 In *Sanders*, the supreme court compared all of the trial testimony previously provided at defendant's trial with the new evidence, specifically the recantation testimony of an eyewitness/co-offender and the newly supplied alibi affidavit of another person, and concluded that the proposed evidence did not provide evidence that was so conclusive, that no reasonable juror would have found the defendant guilty beyond a reasonable doubt. The supreme court thus found that the defendant's petition did not warrant further third-stage review. Upon examination of the trial evidence and the proposed new evidence, I would reach the same conclusion as the supreme court did in *Sanders*.

¶ 220 Contrary to the majority's opinion, we can, without making any credibility determinations, conduct a *de novo* review comparing the new proffered evidence and the evidence presented at trial, and decide whether the new evidence is of such a conclusive character that the outcome of defendant's trial would have been different. *Sanders*, 2016 IL 118123, ¶ 52 ("Even taking the well-pleaded facts as true, we conclude that the recantation [of a witness's testimony identifying the petitioner as participating in a murder] is not of such conclusive character as would probably change the result on retrial."); *Edwards*, 2012 IL 111711, ¶¶ 39-40 (an affidavit stating that petitioner "had nothing to do with this shooting" and was neither "a part [of nor] took part in this

crime," was not "of such conclusive character that it would probably change the result on retrial" (internal quotation marks omitted)).

¶ 221    The majority suggests the State's evidence at trial was weak, however, my review of the actual trial testimony shows it was strong and compelling. The evidence recounted at defendant's trial established that the victim, Ebony Higgins, and the five other people—Omar Muhammed, Jutoy Hoskins, Demario Jackson, Michael Stampley, and Keith Smith—were ambushed by defendant in a drive-by shooting in broad daylight on April 3, 1994, Easter Sunday afternoon.

¶ 222    The witnesses closest to the car, Demario Jackson and Michael Stampley, turned and faced defendant and the blue Buick immediately. Both witnesses saw defendant from a short distance away, and said that there were only two people in the vehicle.  Demario and Michael identified defendant in lineups and at trial as the shooter. Demario testified that he identified defendant "right away" at the lineup, and Michael testified that he recognized defendant as the shooter "as soon as he walked" into the lineup room. Neither of the witnesses wavered in their identifications of defendant at any time. Although the time for observing defendant was brief, both witnesses were able to describe defendant and the car used, and gave the police several key details. Demario, specifically, said that he had seen defendant before in the neighborhood, and noted several details about the blue Buick that was used in the shooting, including the front damage, and the "Y" in the license plate. The witnesses immediately recognized the car a few days later when it was being driven down the street, and were able to get a full license plate number, which was subsequently given to the police.

¶ 223    The vehicle bearing that license plate number was recovered a few days after the shooting, and was processed for fingerprints. Defendant's fingerprint was found inside on the passenger side rear window of that car.

¶ 224  Against this compelling evidence, defendant presented the testimony of a friend, and two family members.

¶ 225  Dejuan Jones, a long time friend of defendant who had recently been convicted of murder, testified that he was in the blue Buick on April 3, 1994, when it was traveling west on 107th Street at about 4:30 p.m. Germaine Bledsoe was driving, and Dejuan was in the backseat on the driver's side. Willie Madlock was in the front passenger seat, and a person named Clay, whose last name was unknown to Jones, was seated in the rear passenger side seat. According to Dejuan, Willie said: "There goes Herman," at which point Germaine drove up on the curb and Willie started shooting. Dejuan testified that Willie was firing from inside the car and was firing at "[p]robably more" than eight or nine people.

¶ 226  Although he knew who "Herman" was, Dejuan did not see him on the street that day. Dejuan testified that he had no prior knowledge that Willie was going to start shooting. There were about four or five shots fired, one right after the other. Dejuan ducked down when the shooting started, and the car was stopped for a couple of seconds while the shots were being fired.

¶ 227  Dejuan described Willie as a 15-year-old young man, about six foot, two or three inches tall, with a thin build, dark complexion and clean shaven. Dejuan acknowledged that he never went to the police after the shooting to tell them what he saw that afternoon. In fact, the only person he spoke to before his testimony in court was defendant's attorney sometime in July of 1994.  He testified that when he heard defendant got locked up for this murder, Dejuan told defendant's mother that he was there. She asked Dejuan if he would "go tell the lawyer what happened," and Dejuan agreed. Defendant's mother did not ask Dejuan to tell the police what happened, and Dejuan did not tell the police or any law enforcement agency what happened at any time before his

testimony at trial. Dejuan denied having any knowledge of where Willie Madlock, Germaine Bledsoe, or Clay might be.

¶ 228 Dejuan, whose credibility was in serious question as a friend of the accused and as a convicted murderer, provided testimony that also conflicted with the State's witnesses in several significant respects. Dejuan said that Willie fired a gun at a crowd of eight or nine people, probably more. This detail conflicts with the other eyewitnesses who stated there were only six people on the sidewalk at the time of the shooting. Dejuan also testified that that there were four people in the car, which directly conflicts with the State's eyewitnesses who placed two, and only two, people in the blue Buick that day. Dejuan also never went to the police after the offense, and never disclosed the fact that he was present for the shooting to anyone other than defendant's attorney, although he knew that defendant had been charged with the murder shortly after it occurred.

¶ 229 The defense also called defendant's aunt and cousin to testify regarding defendant's alibi. Sylvia Stewart testified that defendant is her sister's son, and that he was at her home most of the day on April 3, 1994, at a barbecue to celebrate her son's birthday, which was on March 26. Ms. Stewart left the house that day with defendant in her car to pick up defendant's girlfriend, but then returned to the house with him.

¶ 230 Defendant was at her home from about 2 p.m. until about 10:30 p.m. Ms. Stewart testified that from about 3:30 p.m. until 10:30 p.m., defendant never left her sight, except to use the washroom, which was right off the kitchen. She said she saw him at all times, either outside in the backyard or in the kitchen when she was in the kitchen.

¶ 231 Ms. Stewart said there were probably between 15 to 20 people she had contact with that day at her home. Another of defendant's aunts, Vivian, her son Lavelle, and her young grandchildren, were the only relatives there that day. Ms. Stewart named several of the people who

attended the party, but she could not remember the last names of any of those individuals present, other than her relatives.

¶ 232   Ms. Stewart acknowledged that she knew her nephew was charged with murder within days of the shooting, but other than her testimony at defendant's trial, she never provided any information to the police regarding his presence at her home on April 3, 1994. Ms. Stewart said the information was kept within the family. Ms. Stewart did not indicate when she apparently provided the alibi information to defendant's attorney. Ms. Stewart denied that in August of 1996, she told an investigator, who came to her home to speak to her about defendant's presence at her home, to come back another time when she could get her story straight.

¶ 233   Lavelle Stewart, defendant's cousin, also testified that defendant had attended the barbeque at Ms. Stewart's home. Lavelle testified that defendant's girlfriend, Michelle, came to the party in the afternoon, with some of defendant's friends named "Fonzie," "Poppie," and a guy named "C." Other than one period of time during the day when defendant and his mom went to pick up some friends, defendant remained at the home until about 11 or 11:30 p.m. Lavelle too, did not know, nor could he provide, the last names of any of the people, other than relatives and a person named "Darryl Brown," who attended the barbecue.   Lavelle said that defendant had facial hair and a goatee on April 3, 1994, and that defendant's hair, although not braided that day, was "done" in "fingerwaves," which would be like "cornrolls."

¶ 234   According to Lavelle, the people at the party did not congregate in the yard, but came into the front room of his mother's home. Unlike Ms. Stewart's testimony, Lavelle did not see his cousin at all times during the party, and around 6 or 7 p.m., defendant and Michelle went "upstairs and never came back downstairs." Lavelle was sure, however, that at 4:45 p.m., the critical time of the shooting, defendant was with him and several other people in the front room. Lavelle knew

defendant was charged with the murder by April 5, 1994, but he did not provide any information to the police that defendant had been with him for almost the entire day on April 3, 1994, at any time.

¶ 235   Ms. Stewart's and Lavelle's testimonies conflicted with each other in several ways. Defendant's aunt gave the incredible testimony that her nephew was essentially never out of her sight on April 3, 1994; she said she saw him all day, either in the backyard or kitchen, except when he used the washroom. Lavelle, however, testified that around 6 or 7 p.m., defendant and Michelle went "upstairs and never came back downstairs."

¶ 236   The alibi testimony was also called into question through a stipulation that if Michael Butler were called to testify in rebuttal, he would state that on July 16, 1996, he went to interview Ms. Stewart about her nephew's whereabouts on April 3, 1994, and she told him to return at a later date so she could "get her story straight."

¶ 237   Given the strong evidence presented by the State at trial, the proposed new evidence is not of such conclusive character that it would probably change the result on retrial primarily because not one affidavit is based upon the personal knowledge of the affiant claiming to have been present for the crucial events.

¶ 238   To begin, there is the affidavit of Grace Warren, defendant's mother. Ms. Warren said she spoke to Willie Madlock, "the shooter of EBONY HIGGINS." Ms. Warren stated that Willie "confessed to [her]" on the phone and in person that "he shot EBONY and LARON was not in the car at the time of the shooting." Ms. Warren also averred that she brought Willie Madlock to defendant's attorney's office, but he "did not confess." Ms. Warren signed this affidavit in 2008, almost 14 years after the murder.

¶ 239   Accepting as true that Ms. Warren had conversations with Willie Madlock many years after the event wherein he confessed to her that he was the actual shooter and that Laron Warren

was not present, would not raise any possibility that the outcome of defendant's trial would be different, *i.e.*, it does not meet the test that no reasonable juror, properly instructed, would have convicted defendant beyond a reasonable doubt.

¶ 240   In the remainder of Ms. Warren's affidavit, she describes conversations in which Andrea Young and Rayetta Felton told her about conversations they had with Willie Madlock, and Germaine Bledsoe, respectively.   These statements are obviously not well-pleaded, because they can only be termed hearsay upon hearsay.

¶ 241   Next, there is the affidavit of Andrea Young, who stated that she knows defendant because they were raised in the same neighborhood. Ms. Young says she was contacted by defendant's friend, Aisha Daily, who was trying to talk to people who knew "Germaine Bledsoe and Willie because Germaine and Willie might know something about Petitioner's case." Ms. Young stated that she knew "a guy named Willie who was a friend of Germaine Bledsoe," but she did not know his last name. Ms. Young averred that she believed Germaine was dead, but that Willie still lives in Chicago. Ms. Young stated that Willie knows her nephew, Derrick Diamond. She recalled an occasion when she gave Derrick Diamond a ride to Farwell Park, and once they arrived at the park, she saw "Willie walking towards us." Ms. Young stated that she, Derrick and Willie spoke for a few minutes, and Willie "told us that he knew that [defendant] was in prison for a crime [defendant] did not commit. Willie said he knew [defendant] was innocent because Willie was in a car with Cornelius, Dewayne and Germaine, when the shots were fired." Ms. Young averred that Willie told them "the shooting was a drive by and that it was near 107th Street." Ms. Young said that Willie "admitted that he had the gun and that he fired the gun, though he denied that he intended to kill anyone." Ms. Young says she spoke with Ms. Daily in December 1999, and met with defendant's attorney on February 19, 2000.

¶ 242 Ms. Young's affidavit was sworn to on January 3, 2006. The affidavit in the record indicates that the last zero in 2000, was stricken, and that a 6 was placed over that 0.

¶ 243 This affidavit also has several flaws. First, Ms. Young also claims to have spoken to someone named "Willie" but she does not know his last name. It also contains conclusions, not facts, for example, that Willie knew defendant "was in prison for a crime [he] didn't commit," and that defendant "was innocent." More significant, however, Willie *never* specifically said that defendant was not in the car, only that Willie, Cornelius, Dewayne and Germaine were in the car when the shots were fired.

¶ 244 Willie also told Ms. Young that he did not intend to kill anyone. The suggestion that the real offender, Willie, did not intend to kill anyone is completely rebutted by Dejuan's testimony, and the State's witnesses who testified that the shooter pointed a black revolver directly at the group walking on the sidewalk and fired the weapon at the group multiple times. The information related to Ms. Young also introduces a new person named Cornelius as a person in the vehicle at the time of the shooting. This information, coming years after the shooting, that a person named Cornelius was involved and in the vehicle, is also rebutted by both the State's witnesses and the defense's earlier defense testimony.

¶ 245 Similar to the affidavit in *Edwards*, the statement of Ms. Young describing Willie's statements does not negate defendant's presence at the scene of the shooting. Accordingly, this is not the type of evidence, even accepted as true, that is so convincing as to raise a probability that it is more likely than not that no reasonable juror would have convicted defendant. *Edwards*, 2012 IL 111711, ¶ 40.

¶ 246 Next, there is the affidavit of Rayetta Felton, whose four sons knew defendant for years because they all lived in the same area. Ms. Felton states in her affidavit that she spoke to

Germaine Bledsoe, who happened to stop by her home to ask her about her son, Reginald. After they talked for a few minutes, Germaine said he felt bad because defendant was in prison for a crime he did not commit. Germaine knew defendant was not the shooter because Germaine was driving the car, and defendant was not present. Germaine did not say who fired the shots, but said that he was in the car with Willie, DeShawn and Cornelius. Ms. Felton averred that she thinks Germaine was no longer in Chicago, but was now living in Atlanta.

¶ 247  This affidavit again is not based upon personal knowledge,[7] or an eyewitness account, nor does it contain any declaration against penal interest. Further, it does not state any facts about when the alleged shooting incident occurred. It does not refer to the victim, where the shooting took place, or anything about the nature of the offense that would indicate which shooting defendant was "not present" for. Once again, however, accepting all of these statements as *true* and as new evidence, they do not raise the probability that, in light of this new evidence, compared with all of the evidence presented at defendant's trial, it is more likely than not, no reasonable juror would have found defendant guilty. This evidence is not of such conclusive character that it would probably change the result on retrial.

---

[7] The majority appears to misunderstand my understanding of what personal knowledge is. Personal knowledge should contain factual propositions upon which a witness could competently testify. Generally, a statement of a third party made out of court is not a factual proposition upon which a witness could testify to at any hearing. The affidavits here are not based upon personal knowledge—they are recountings of what another person allegedly told the affiant that he observed, rather than what the affiant personally observed.

¶ 248   Finally, Aisha Daily provided an affidavit, dated January 2006, which indicates that she "first came in contact with [defendant] since his incarceration in 1999."   For a reason not disclosed in the affidavit, Ms. Daily began to ask people in the neighborhood if "they knew a guy named Willie as well as Germain[e] because I wanted to see what they knew about the case."   She stated that "[o]ne day in 2001 Willie came by my house and he spoke with me about the case at hand. During this conversation he mentioned that he was the actual shooter and that the [defendant] was not involved." Ms. Daily also stated that Willie came to her house again and mentioned he wanted to speak with defendant's lawyer, so that he could "let the lawyer know it was him and not the [defendant] that was there when the crime happened." Ms. Daily averred that Willie went to the lawyer's office, but did not confess.

¶ 249   This affidavit contains several defects. It is not based upon any personal knowledge of the affiant. The conversations are with a person named only "Willie," in which "Willie" does not state who, when or where he shot someone. Nonetheless, despite these defects, these conclusory statements are almost identical to those rejected in *Edwards*, where the supreme court concluded that the proffered affidavit stating that the affiant and two others were "the shooters," and that the petitioner "had nothing to do with this shooting," was not "of such conclusive character that it would probably change the result on retrial." (Internal quotation marks omitted.) *Edwards*, 2012 IL 111711, ¶¶ 39-40. While acknowledging that the petitioner in *Edwards* was found guilty under a theory of accountability, the affidavit in this case is even weaker than the affidavit in *Edwards*, where the affiants here are merely recounting conversations with a third party who is claiming responsibility for the crime. Thus, even if one assumes that all of these statements are true, the proffered testimony that a man named "Willie" would confess to a perfect stranger, seven years

after the event that he "was the actual shooter" and that defendant was not involved, is not the type of testimony that would, more likely than not, change the outcome of defendant's earlier trial.

¶ 250 After reviewing all of the affidavits above, what remains is that not a single affidavit contains an eyewitness account or is based upon the personal knowledge of the affiant, but is a recounting of conversations with third-party declarants. Even if we accept all of these statements as true, which we are required to do, and if the new evidence was considered against all the evidence presented at defendant's trial, the statements do not raise the probability that it is more likely than not, that no reasonable juror would have convicted defendant beyond a reasonable doubt. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

¶ 251 In *Sanders*, the supreme court noted that proposed or proffered testimony that contradicts previously presented trial evidence and that merely adds conflicting evidence to that trial evidence, is not the type of evidence that is of "such conclusive character as would probably change the result on retrial." *Sanders*, 2016 IL 118123, ¶ 52. That is essentially what has been presented here; these alleged statements made by unavailable declarants, contradict what was already presented at defendant's trial and some of it actually contradicts defendant's own witness. To proceed to second-stage postconviction proceedings, something more than rank hearsay should be provided.

¶ 252 As the United States Supreme Court has stated, claims of actual innocence must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Discounting, as we should, any reliability or trustworthiness concerns of the proffered evidence, and accepting as true all of the statements contained in the affidavits, the question remains whether defendant has presented evidence that is so conclusive that no reasonable juror would have found him guilty. In my opinion, defendant has not done so.

¶ 253   While there may be other types of evidence that could support an actual innocence claim, the evidence here is so far removed from the evidence described in *Schlup*, and does not in any way comport with the traditional types of competent evidence that would be accepted for actual innocence claims.

¶ 254   The fact-finder at defendant's trial heard from a number of witnesses, and has already rejected defendant's claim of innocence, based on testimony that another person committed the crime and that defendant had an alibi. Defendant is essentially trying to have a second trial in which to contest reasonable doubt. This is not the purpose of actual innocence claims in the postconviction act. *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991) ("The purpose of a postconviction proceeding is not to determine guilt or innocence, but to inquire into constitutional issues which have not been, and could not have been, previously adjudicated."); *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 38; *People v. Collier*, 387 Ill. App. 3d 630, 638 (2008).

¶ 255   By my dissent, I do not mean to suggest that successive petitions presenting colorable claims of actual innocence should be dismissed at the first stage of proceedings. Nor do I mean to suggest that trial courts should be making credibility determinations at the first or second stages of successive postconviction proceedings. Nor, should trial courts or this court make evidentiary rulings on the proffered affidavits. However, those claims still must be supported by allegations that are capable of objective or independent corroboration, and petitioner must still meet the "no reasonable juror" standard. Had defendant presented, "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" (*Schlup*, 513 U.S. at 324) or any other analogous type of evidence presenting a colorable claim, I would not hesitate to vacate the dismissal.

¶ 256   If the type of affidavits supplied here warrant further review, courts will never have the appropriate time to spend on actual innocence claims that meet the requirements of the Act. As the *Tenney* court pointed out, the kind of unsworn, out-of-court statements that are at issue in this case are generally inadmissible because allowing such admissions "could seriously handicap the administration of justice in tempting everyone accused of crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime." (Internal quotation marks omitted.) *Tenney*, 205 Ill. 2d at 433.

¶ 257   It does not matter here that there are four affidavits filed with the successive petition. It is not the number of affidavits that a petitioner files, but the content of those affidavits, accepted as true, that determines whether the petition can survive a first-stage dismissal. The proffered affidavits here are simply not capable of any objective or independent corroboration, and that is why they fail. If this successive petition can survive dismissal, it is my opinion that the administration of justice will be severely handicapped. There would be no limit to the number of successive petitions filed; there would be no finality to any convictions. To allow this petition to move forward will essentially go beyond the boundaries of the Act, and will permit for an unprecedented opening for claims involving third-party admissions not based upon any firsthand eyewitness accounts, reliable or otherwise.

¶ 258   For the foregoing reasons, I would remand for a new sentencing hearing pursuant to *People v. Davis*, 2014 IL 115595, and affirm the judgment of the circuit court of Cook County in all other respects.